IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

                                     Case No. 17-CR-02949-MV

  v.

DASHAWN ROBERTSON,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendant Dashawn Robertson's Motion to Suppress Identification Evidence. Doc. 34. The government filed a timely Response in Opposition. Doc. 38. The Court then held an evidentiary hearing on the motion over the course of two days–November 4, 2019, and December 10, 2019–during which time it received exhibits and heard testimony from four witnesses. Having now considered the motion, exhibits, witness testimony, relevant law, and being otherwise fully informed, the Court finds that the motion is not well-taken and will accordingly be **DENIED**.

## BACKGROUND

This case arises from the shooting of Desmick Sharber on September 12, 2017. Doc. 38 at 2. While the defense does not dispute the fact that Mr. Sharber was shot, it contends that his identification of Defendant Dashawn Robertson as the shooter was mistaken due to unduly suggestive procedures used by the police. Doc. 34. At issue in this motion is whether the Court should accordingly bar evidence of the identification at trial under the Fifth Amendment's Due Process Clause or Federal Rule of Evidence 403. *See id.* The following represents the Court's findings of fact, based on the exhibits submitted by the parties and the testimony received at the

evidentiary hearing.[1]

## I.     Facts

At approximately 12:27 a.m. on the morning of September 12, 2017, officers with the Albuquerque Police Department responded to a report of a shooting in a parking lot near 1331 Ortiz Drive Southeast. Doc. 55 at 9:13–17 (Transcript of November 4, 2019 Evidentiary Hearing) ("Tr."). Upon arriving, the responding officers learned that a male victim named Desmick Sharber had been shot eight times in the chest and had been taken to the Veterans Association hospital down the street. Tr. 9:21–10:7. Kacy Ramos, a Task Force Officer (TFO) working with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), arrived shortly thereafter and took over the investigation. *Id*. at 7:13–20; 10:11–12.

TFO Ramos testified that he interviewed several witnesses at the scene of the shooting. *Id*. at 10:16. One was Miesha Benson, Mr. Sharber's girlfriend and the mother of his child. *Id*. at 10:19–11:4. Ms. Benson told TFO Ramos that she was asleep in her apartment when she heard several gunshots and the sound of a motorcycle. *Id*. at 11:4–6. She then ran down to the parking lot, where she saw Mr. Sharber lying on the ground unconscious. *Id*. at 11:6–10. Ms. Benson then loaded Mr. Sharber into the back of her vehicle with the help of several bystanders and drove him to the hospital. *Id*. at 11:12–13.

---

[1] When ruling on a motion to suppress, the Court must state its essential findings on the record. *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for Rule 12(d)'s purposes. The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search. *See United States v. Merritt,* 695 F.2d 1263, 1269–70 (10th Cir. 1982) ("[U]nder Rule[ ] 104(a) ..., the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'") (quoting *United States v. Matlock,* 415 U.S. 164, 174 (1974)). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. *See* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.").

Ms. Benson also told TFO Ramos that she believed the shooting was related to rumors on the street that Mr. Sharber had "snitched" on a person named Angelo Burdex several years earlier. *Id*. at 11:23–12:10. ATF Special Agent (SA) Erik Haanes testified about the history between the two men. In the fall of 2015, the ATF was investigating Mr. Sharber for distributing crack cocaine in the Albuquerque area. *Id*. at 91:11–24. Agents set up two controlled drug buys to bust him, and during those controlled transactions observed him interacting with a second man who appeared to be his supplier. *Id*. at 92–93. Mr. Sharber was subsequently arrested, and during a post-arrest interview identified the supplier as Angelo Burdex. *Id*. at 94:16–18. In November of 2015, a federal grand jury returned an indictment charging both Mr. Sharber and Mr. Burdex with conspiracy to commit drug-trafficking. *Id*. at 95:7–9. Both pled guilty, and Burdex was sentenced in 2016 to five years in prison. *Id*. at 95:15–16, 21–22; 12:13–15. Ms. Benson told TFO Ramos that she thought the shooting had to do with the Burdex case because one of Mr. Burdex's sisters had recently attacked her for dating Mr. Sharber, whom the Burdex family considered a "rat." *Id*. at 13:22–24.

In addition to providing TFO Ramos with a potential motive for the shooting, Ms. Benson also provided the name of the potential shooter. In a second interview at the hospital, she relayed that she had heard from friends and others on the street that the shooter was a person named "SS" or "Super Sport." *Id*. at 15:4–5, 17–21. Ms. Benson also stated that she had seen SS at a mutual acquaintance's house two weeks earlier. There, he reportedly complained about Mr. Sharber sending Angelo Burdex to prison by ratting on him and said that he was "watching out" for Sharber, a statement Ms. Benson took as a threat. *Id*. at 18:3–9; 19:15–19. After Ms. Benson named "SS" as the potential shooter, TFO Ramos contacted a detective in the Albuquerque Police Department's gang unit who immediately identified him as the defendant, Dashawn Robertson.

*Id*. at 20:1–7.

TFO Ramos also interviewed a second witness near the scene of the shooting, a person referred to as "C.G." *Id*. at 25:17–21. C.G. stated that he was standing on the balcony of an apartment building facing the parking lot when he heard a verbal altercation begin to take place. *Id*. at 26:1–4. He then reportedly heard someone say "I'm your bro" before several gunshots rang out. *Id*. at 64:4–21. C.G. then saw people scattering and observed a black male with a white shirt running from the area. *Id*. 26:6–8.

Mr. Sharber could not be interviewed on the night of the shooting because he was taken into surgery immediately. *Id*. at 83:11–13. TFO Ramos instead planned to speak with him at the hospital the next morning, approximately 36 hours after the shooting. *Id*. at 83:20. Before leaving for the hospital, TFO Ramos pulled a driver's license photograph of Mr. Robertson from a police database, a copy of which has been admitted into evidence as Government's Exhibit 1. *Id*. at 20:13–21; 24:3. He then alerted Special Agent Haanes and another Task Force Officer, Tim Hotle, that he had identified a suspect. *Id*. at 20:13–15.

Present at the hospital on the morning of September 13 were TFO Ramos, Special Agent Haanes, TFO Hotle, and Special Agent Nathan Campton. *Id*. at 28:18–19. The officers first showed the driver's license photograph to Ms. Benson, who was in the waiting room of the intensive care unit. *Id*. at 24:13–14. She identified the pictured individual as SS, the person rumored to be the shooter and whom she had seen making threatening statements about Mr. Sharber two weeks prior. *Id*. at 24:15–16. The officers then entered Mr. Sharber's hospital room after receiving permission to do so from a nurse. *Id*. at 82:8–14. The audio recording of the conversation that followed, as well as a transcript of it, were admitted at the hearing as Government's Exhibits 2 and 3. *Id*. at 30:2; 36:21. An enhanced version of the audio recording

was also admitted as Defendant's Exhibit B.  *Id*. at 125:22.

After a brief period of small talk, SA Haanes started the questioning by stating: "I have my suspicions on how this happened. Is it back related to our deal? No?"  Gov't Ex. 3 at 2:16–18.  The transcript next shows an unidentified male speaker asking "Deshawn?"  *Id*. at 19.  In the enhanced version of the audio recording, however, the speaker can also be heard asking about another name as well: "Deshannon."  Def. Ex. B.  Although "Deshannon" sounds close to Dashawn, TFO Ramos testified that it actually refers to Angelo Burdex, whose middle name is Deshannon.  Tr. at 71:9–11.  In response to the unidentified speaker asking "Deshawn? Deshannon?" Mr. Sharber responded, "Yeah."  Gov't Ex. 3 at 2:20.  Several moments later, the following exchange occurred:

**SA Haanes:** But he thinks you are. Who did this?

**Sharber:** I don't know his real name.

**SA Haanes:** What's his name?

**Sharber:** SS.

**SA Hotle:** SS?

**Sharber:** Super Sport.

**SA Haanes:** Super Sport?

**Sharber:** Yeah.

**SA Hotle:** Dwayne Johnson, Dashawn Johnson.

**Sharber:** Something like that.

**SA Hotle:** Is it Dwayne or Dashawn? I just wanted to make sure.

**Sharber:** [Inaudible] I don't know.

*Id*. at 3:13–4:1. When subsequently asked how he knew SS, Mr. Sharber replied, "I've been knowing him for a while." *Id*. at 4:3–4.  Sharber also shared other information during the interview

that indicated he was familiar with SS prior to the shooting, including that SS had a house off of Santa Fe Drive [*Id.* at 11:15–18]; that he was a member of the Gangster Disciples [*Id.* at 13:3]; and that he and Angelo Burdex both sold drugs [*Id.* at 15:14–15]. Mr. Sharber noted that he had not seen SS since he had been out of jail, however, and the officers never confirmed whether SS in fact lived at the address Mr. Sharber provided. *Id.* at 12:11–18; 69:14–21.

After Mr. Sharber's verbal identification of SS, SA Haanes showed him the driver's license photograph of Mr. Robertson that TFO Ramos had printed out earlier. Tr. 40:19–41:5. An unidentified male speaker, presumably one of the officers, asked, "That's him?" Gov't Ex. 3 at 4:19. SA Haanes then followed with, "He is the one that pulled the trigger on you?" *Id.* at 4:20–21. Although the transcript does not record an audible response from Mr. Sharber, TFO Ramos testified that he sat up, looked at the picture, and "confirmed that that was SS or Super Sport." Tr. 41:8. Ramos further testified that Mr. Sharber displayed "no hesitation at all" when making the identification and that there was "no doubt [Mr. Sharber] was 100 percent sure that he knew that was who shot him." *Id.* at 41:12–16.

The officers then asked Mr. Sharber to describe exactly what happened on the night of the shooting. He said that he was outside with Ms. Benson "smoking a blunt" when he noticed a Mexican man he had never seen before. Gov't Ex. 3 at 6:2–5. The Mexican man started fighting with another individual, and when he tried to break it up, "SS came out of nowhere." *Id.* at 6:7–18. SS then reportedly asked "Don't I know you?" to which Mr. Sharber replied "You know who I am." *Id.* at 6:20–22. SS then reportedly told Sharber "You messed up $9,000." *Id.* at 6:22–23. Mr. Sharber later explained that he wasn't sure what the reference to the $9,000 meant, but figured that it "had to be" about drugs. *Id.* at 20:11–19.

Mr. Sharber then told the officers, "I didn't see him pull his gun out, and then he started

shooting at me, but I didn't fall right away. [Inaudible] I fell and because I got–my legs and stuff just got weak. I tried to crawl to the door." *Id*. at 7:12–15. Sharber additionally stated that SS "was arguing with some female, and he was, like, across from me when I seen him." *Id*. at 7:17–18. Sharber later added that SS was "already there" in the parking lot and he "[saw] him just walk up." *Id*. at 8:15–20. On cross-examination, TFO Ramos described the parking lot as "dark" but with ambient light due to streetlights that were present. Tr. 68:18–19. He further testified that, in his opinion, "you could see relatively easily" at the scene. *Id*.

The defense's first witness at the evidentiary hearing was Dr. Raimund J. Carillo, Jr., whom it tendered as an expert in the field of audio enhancements. *Id*. at 120:18–19. Dr. Carillo testified about producing Defendant's Exhibit B, the enhanced version of the audio recording of the Sharber interview. *Id*. at 125:22.

The defense then called its second and final witness, Dr. Roy S. Malpass, a former Professor Emeritus of Psychology at the University of Texas at El Paso, whom it tendered as an expert in the field of identification psychology due to his research on facial recognition, live witness identification, and "various aspects of identification lineups and photo spreads." *Id*. at 127:8–19, 130:3–18. Dr. Malpass testified that the optimal procedure for obtaining an eyewitness identification is a photo spread consisting of six photographs, one depicting the suspect and the other five depicting innocent people who physically resemble the suspect. *Id*. at 142:16–143:1. He further stated that the officer administering the spread should be blind to the location of the suspect and should give the eyewitness certain admonitions designed to reduce the chance of a false identification, including that the offender may or may not be present in the spread; that the eyewitness is not obliged to make an identification; and that it is just as important to exonerate an innocent person as it is to identify a guilty person. *Id*. at 143:3–23.

Dr. Malpass additionally testified that stress has a complex effect on the accuracy of eyewitness identifications. He stated that moderate levels of stress actually improve eyewitness memory due to increased attention, but that higher levels, such as those experienced by a person who "fears for their life or is in great pain or under great threat," disrupts the formation of memory and lowers the reliability of a subsequent identification. *Id*. at 144:10–17. He also testified that while prior familiarity can create a "large advantage" in the accuracy of an eyewitness identification, the eyewitness needs to have observed the person's face on multiple occasions from multiple angles in order to benefit from the familiarity. *Id*. at 147:3–5. In other words, Dr. Malpass stated, having a personal relationship with a suspect is more conducive to an accurate identification than simply having seen them around on a few occasions prior to the incident in question. *Id*. at 157:16–24.

Dr. Malpass then rendered his opinion on the adequacy of the identification procedures employed by the officers in this case. He first noted that SA Haanes' act of showing Mr. Sharber a single photograph of Mr. Robertson at the hospital would be considered a "show-up," which is an inferior procedure to a multi-suspect lineup because it "leads to a higher rate of false identifications." *Id*. at 146:4–10. He also noted that the show-up procedure the officers used lacked the recommended protections like initial admonitions and a blind administrator, and that show-up procedures in general should not be used more than 24 hours after an incident occurs. *Id*. at 166:10–14; 148:17–24. Dr. Malpass additionally testified that, if the officers had in fact proffered a name to Mr. Sharber at the beginning of the interview, that would have been improper because it could have prompted an agreement from Mr. Sharber, especially if he was prone to defer to law enforcement. *Id*. at 149:15–23. Dr. Malpass concluded that the identification procedures the officers used are "pretty much at the bottom of the list in terms of adequacy" and were not an

adequate means of establishing an identification of Mr. Robertson.  *Id*. at 148:8–9; 154:22–155:4.

The government cross-examined Dr. Malpass after receiving a continuance to review his curriculum vitae and the studies upon which he relied.  As to the effects of stress on memory, Dr. Malpass acknowledged that one study found memory to be better for negative emotional events than for neutral events, due to the greater focusing of attention negative events can cause.  Doc. 59 at 12:10–18 (Transcript of December 10, 2019 Continued Evidentiary Hearing) ("Cont'd. Tr.").  As to the benefits of familiarity, the Assistant United States Attorney (AUSA) conducting the cross-examination asked if Dr. Malpass had recognized him in the parking lot prior to the hearing.  *Id*. at 27:6–8.  Dr. Malpass replied that he had, and that the recognition took "less than five seconds," despite the fact that he had only met the AUSA once before at the previous hearing.  *Id*. at 27:9–16.  He also agreed that "subjects can identify 90 percent of their former classmates' faces within 15 years of graduation" [*Id*. at 28:9–12] and that there is no consensus on the precise number of past interactions individuals have to have before they gain enough familiarity to accurately identify each other [*Id*. at 23:24–24:12].

## II.    Procedural Background

On October 24, 2017, Mr. Robertson was charged in a three-count indictment with Obstruction of Justice by Retaliating Against a Witness, Victim, or Informant, in violation of 18 U.S.C. § 1513(a)(1)(B); Using, Carrying, and Discharging a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c); and Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1).  Doc. 2.  On May 28, 2019, he filed his Motion to Suppress Identification Evidence.  Doc. 34.  First, Mr. Robertson argues that evidence of Mr. Sharber's identification should be suppressed under the Due Process Clause of the Fifth Amendment because the single-photograph show-up procedure the officers used was

impermissibly suggestive and because the resulting identification is not sufficiently reliable to overcome its suggestive origins.[2]  *Id*. at 4–12.  Mr. Robertson additionally argues that the identification evidence should be suppressed under the Federal Rules of Evidence because it is substantially more prejudicial than probative.  *Id*. at 12.  In support, he asserts that Mr. Sharber's identification is "devoid of probative value" because it is "wholly unreliable" and that its introduction would be highly prejudicial due to the weight that juries typically place on identification evidence.  *Id*. at 13–14.

The government makes a number of arguments in response.  First, citing *Perry v. New Hampshire*, 565 U.S. 228, 248 (2012), it argues that Mr. Sharber's identification was not produced by improper police conduct because, among other things, "the meeting was not exactly arranged by the police–Sharber was in the hospital because he had been shot and was receiving medical care, and the police simply visited him where he was."  Doc. 38 at 8.  It next argues that the identification procedures used by the officers were not impermissibly suggestive because Mr. Sharber identified the shooter as "SS" before any other names were suggested and because Sharber "already knew the identity of the shooter" when he was shown the single photograph.  *Id*. at 9.  As to reliability, the government submits that Mr. Sharber had a "full and fair opportunity to view [Mr. Robertson] before the shooting" because he saw Mr. Robertson walk up to the parking lot, exchanged words with him, and did not fall down right away once the shooting began.  *Id*. at 9–10.  It also points to the "strong evidence of familiarity… tying Sharber to [Mr. Robertson]" and submits that "[t]his is not a case where one stranger identified another stranger… rather, it is a case where the victim identified a known associate or acquaintance."  *Id*. at 8.

---

[2] The Court notes that while the defense correctly identified the reliability factors laid out in *Neil v. Biggers*, 409 U.S. 188, 198 (1972), it did not apply them.  Instead, the defense simply stated, "In this case, a review of all of these factors indicates that the complainant's identification of Mr. Robertson is wholly unreliable."  *See* Doc. 34 at 11–12.

The government further argues that even if the Court were to find that the procedures employed were unduly suggestive, it should not suppress the identification because its reliability is a question traditionally left to the jury and because it will be subject to other Due Process protections such as cross-examination, the testimony of a defense expert, and jury instructions if necessary. *Id*. at 10–12. Finally, the government argues that the identification evidence should not be excluded under Federal Rule of Evidence 403 because it goes to prove that "[Mr. Robertson] shot Sharber because [he] believed Sharber cooperated with law enforcement" and because any prejudice it will cause Mr. Robertson will not be unfair. *Id*. at 13–14.

## STANDARD

### I.      The Admissibility of Pre-Trial Identifications Under the Due Process Clause

Courts have articulated a two-pronged test for analyzing the admissibility of a pre-trial identification under the Due Process Clause. First, the reviewing court must evaluate whether the identification procedures used were "unnecessarily suggestive." *United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000) (citations omitted). If so, the court must next consider whether, under the totality of the circumstances, the identification is nevertheless reliable. *Id*. (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)). An identification must fail at both stages to be excludable on Due Process grounds. *See, e.g., Bredy*, 209 F.3d at 1195 (assuming arguendo the identification procedure was unnecessarily suggestive and still finding the identification admissible because it was sufficiently reliable).

#### A.  Suggestiveness

Courts have long found single-suspect "show-up" procedures to be impermissibly suggestive. The Supreme Court first commented on this kind of identification in *Stovall v. Denno*, 388 U.S. 293, 302 (1967) (abrogated on other grounds in *United States v. Johnson*, 457 U.S. 537

(1982)), where it stated, "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."  A show-up identification was again before the Court ten years later in *Manson v. Brathwaite*, 432 U.S. 98 (1977).  There, an undercover officer identified the defendant from a single photograph and then testified about the identification at trial.  *Id*. at 101–02.  On habeas review, the United States District Court for the District of Connecticut ruled that the identification was impermissibly suggestive, finding the issue "clear" under Second Circuit law.  *Id*. at 108.  The Second Circuit affirmed, and in the Supreme Court, the government conceded the point, acknowledging "at the outset… that the procedure in the instant case was suggestive."  *Id*. at 109 (internal quotations omitted).

The Tenth Circuit has likewise proclaimed: "With respect to [] suggestiveness… we note that, in general, show-up identifications (those involving the identification of a single individual) are less than ideal."  *United States v. Natalini*, 42 Fed. Appx. 122, 127 (10th  Cir. 2002) (unpublished).  It has accordingly advised that "such procedures should be employed only if compelled by extraordinary circumstances."  *Id*.  As another district court in the District of New Mexico recently explained, show-up procedures are impermissibly suggestive because they imply "that the police have their man."  *United States v. Silva*, Case No. 14-CR-4067 JAP, 2016 WL 10587962, at *6 (D.N.M.  Mar. 4, 2016) (unreported) (citations omitted).  In that case, the court ruled that a detective's decision to show an eyewitness "only one possible suspect during the identification process" was "completely unwarranted" and unduly suggestive. *Id*. at *6.  The court also found that the detective's "coaching" during the identification process contributed to its suggestiveness. *Id*. at *7.

Similarly, in *Grubbs v. Harrington*, the Tenth Circuit found a pre-trial identification procedure to be unnecessarily suggestive where the police had informed the eyewitness prior to

the identification that they had a suspect, the kind of coaching that "has long been recognized by the courts as an important factor in determining whether a pre-trial lineup procedure was impermissibly suggestive." 982 F.2d 1483, 1490 (10th Cir. 1993) (citations omitted). The fact that the police used a six-person photo spread did not change the result because four of the individuals in the spread had facial characteristics "noticeably dissimilar" from those of the suspect. *Id.*

An impermissibly suggestive identification procedure is nevertheless constitutional if its suggestiveness is a function of necessity, such as the need to obtain an identification from a witness who is at risk of dying. *See Perry v. New Hampshire*, 565 U.S. 228, 238 (2012) (citing *Stovall*, 388 U.S. at 302).

## B. Reliability

Because "reliability is the linchpin in determining the admissibility of identification testimony," *Brathwaite*, 432 U.S. at 114, an identification procured through unnecessarily suggestive means is still admissible if it is sufficiently reliable. *Bredy*, 209 F.3d at 1195. The reliability of an identification is evaluated under the totality of the circumstances to determine whether the suggestive procedure "created a substantial likelihood of irreparable misidentification." *Id.* (quoting *United States v. Thody*, 978 F.2d 625, 629 (10th Cir. 1992)). Put another way, "[a] pretrial identification procedure does not violate due process unless it is so unnecessarily suggestive that it is conducive to irreparable mistaken identification." *Id.* (citations and internal quotations omitted). "Short of that point, such evidence is for the jury to weigh" because "evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Brathwaite*, 432 U.S. at 116.

Courts evaluate the reliability identification evidence under the factors set forth in *Neil v. Biggers*, 409 U.S. 199–200 (1972). They are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id*. Applying these factors to the case at hand, the Court in *Biggers* found no substantial likelihood of misidentification where the victim saw her assailant under artificial light in her house and under a full moon outdoors; faced him "directly and intimately;" provided a thorough description to the police; and had "no doubt" that the defendant was her attacker. *Id*. at 200. The Court noted that while the seven-month lapse between attack and the confrontation "would be a seriously negative factor in most cases," it was not enough to outweigh the other indicia of reliability. *Id*. at 201.

The Tenth Circuit had the opportunity to apply the *Biggers* factors to a show-up identification in *United States v. Natalini*. 42 Fed. Appx. at 127. First, it found that the eyewitness had an adequate opportunity to view the robber where she saw him enter the bank and where he then "proceeded directly to her teller station and stood right in front of her." *Id*. Second, it found that she paid close attention because she gave a detailed description of the robber's clothing and weapon and activated a silent alarm as he exited the bank. *Id*. Third, the Court characterized the witness' descriptions of the suspect as detailed and consistent. *Id*. at 127-28. Fourth, it noted that she "expressed no doubt or hesitancy in her identification of the robber." *Id*. at 128. Fifth and finally, the Tenth Circuit stated that the "two-hour gap between the robbery and the identification is insufficient to cast doubt upon the reliability of the identification," noting that neither it nor the Supreme Court has established any bright-line rules as to temporal proximity. *Id*. at 128. The Tenth Circuit accordingly concluded that the identification was reliable under the *Biggers* factors

and was properly admitted. *Id.*

### C. Pretrial Screening Under *Perry v. New Hampshire*

Finally, in *Perry*, the Supreme Court recently clarified that because its decisions on the constitutionality of identification evidence "turn on the presence of state action and aim to deter police from rigging identification procedures," pretrial screening for reliability under the Due Process Clause is not required where "the suggestive circumstances were not arranged by law enforcement officers." 565 U.S. at 232. In that case, the police responded to reports of someone breaking into a car. *Id.* at 233. Upon arriving at the scene, an officer observed a man standing in between two cars with car stereo equipment in hand. *Id.* She then asked the man to wait with another officer while she entered a nearby apartment building to speak with an eyewitness. *Id.* The first officer then asked the eyewitness to describe the man she observed. *Id.* at 234. In response, the eyewitness pointed to her kitchen window and said that the person she saw breaking into the car was standing in the parking lot next to the other officer. *Id.* The defendant later challenged the identification on the grounds that it was an impermissible show-up procedure in violation of Due Process. *Id.* The trial court denied the challenge because the identification was made "spontaneously" and was not "manufacture[d]… by the police," and the Supreme Court affirmed. *Id.* at 235. It held that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id.* at 248.

### II.     Exclusion Under Federal Rule of Evidence 403

Federal Rule of Evidence 403 permits courts to exclude relevant evidence if its probative value is "substantially outweighed" by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403. "Unfair prejudice" means "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Isabella*, 918 F.2d 816, 837 (10th Cir. 2019) (citations omitted). In other words, "the term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). While district courts have "considerable discretion in performing the Rule 403 balancing test," excluding otherwise admissible evidence under the Rule is an "extraordinary remedy and should be used sparingly." *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001) (citations omitted).

## DISCUSSION

### I. Due Process

As to Mr. Robertson's first argument that evidence of Mr. Sharber's identification should be excluded from trial on Due Process grounds, the Court finds that the identification procedures used by the officers were indeed unnecessarily suggestive. However, it also finds that the resulting identification was not so unreliable as to create a "substantial likelihood of irreparable misidentification." *Bredy*, 209 F.3d at 1195. Accordingly, the Due Process Clause does not require the exclusion of the challenged evidence. *Id.*

#### A. Applicability of *Perry v. New Hampshire*

First, the Court rejects the government's threshold argument under *Perry* that a Due Process reliability analysis is unnecessary because the police did not arrange an identification in this case. Doc. 38 at 7–8. Unlike the "spontaneous" identification in *Perry*, here TFO Ramos deliberately searched a police database for a picture of Mr. Robertson, printed it out, and brought it to the hospital for the purpose of showing it to Mr. Sharber. Tr. 20:13–21. He and three other

law enforcement officers then entered Sharber's hospital room and almost immediately asked, "Who did this?" before showing him the photograph. Gov't Ex. 3 at 3:13; Tr. 40:19–41:5. The government's contention that the meeting "was not exactly arranged by the police" and that the officers "simply visited [Mr. Sharber] where he was" strains credulity. The officers in this case clearly arranged and executed an identification procedure, and the identification they procured is therefore subject to constitutional scrutiny.

**B. Suggestiveness**

The Court further finds that the identification procedures the officers used were impermissibly and unnecessarily suggestive. Two main factors compel this finding. First, by presenting Mr. Robertson as the only suspect for Mr. Sharber to identify, the officers conducted a show-up. Tr. 146:4–10. As explained above, show-up procedures have been "widely condemned" for over 50 years and have been declared impermissibly suggestive by numerous courts. *See Stovall*, 388 U.S. at 302; *Brathwaite*, 432 U.S. at 109; *Natalini*, 42 Fed. Appx. at 127; *Silva*, 2016 WL 10587962 at *6. By showing Mr. Sharber the single photograph of Mr. Robertson, the officers were strongly signaling that they "[had] their man," *Silva*, 2016 WL 10587962 at *6, a suggestion not mitigated by any of the protective measures Dr. Malpass identified, such as the inclusion of other potential suspects in a photo spread, the use of a blind administrator, or the reading of cautionary admonitions. Tr. 142:16–143:1; 143:3–23.

Second, the record reveals several instances of the officers coaching the identification, a practice that has "long been recognized by the courts as an important factor in determining whether a pre-trial lineup procedure was impermissibly suggestive." *Grubbs*, 982 F.2d at 1490. For one, the government's argument that Mr. Sharber provided the name "SS" without any help or interference is undercut by its own transcript, which reflects that an unidentified male asked,

"Deshawn?" before Sharber said anything. Gov't Ex. 3 at 2:19. The same speaker can be heard saying the name "Deshannon" on the enhanced recording as well. *See* Def. Ex. B. It therefore appears that one of the police officers present in the hospital room suggested two names before Mr. Sharber identified anyone. The transcript further reflects that immediately after Mr. Sharber named SS as the shooter, SA Hotle suggested two names very similar to the defendant's: "Dwayne Johnson" and "Dashawn Johnson." Gov't Ex. 3 at 3:22. According to TFO Ramos, these incorrect names were not provided to test Sharber's reliability; instead, he believes SA Hotle meant to provide Mr. Robertson's actual name and was simply mistaken. *See* Tr. 81:14–82:3. Finally, the officers made suggestive statements when showing Mr. Sharber the photograph of Mr. Robertson, asking "That's him?" and "He is the one who pulled the trigger on you?" Gov't Ex. 3 at 4:19–21.

Nor were the suggestive procedures used by the officers justified by necessity. Unlike in *Stovall*, where "no one knew how long [the eyewitness] might live," 368 U.S. at 302, here Mr. Sharber had been out of surgery for approximately 36 hours and was stable enough for the attending nurse to permit four officers into his room. The officers had plenty of time to arrange a less suggestive identification procedure, such as a photo spread, and had no need for the widely condemned practices they used instead. The Court accordingly finds that the identification procedures used in this case were unnecessarily suggestive. *See Bredy*, 209 F.3d at 1195.

## C. Reliability

Despite the suggestiveness of the procedures used, Mr. Robertson's Due Process challenge fails at the final stage because the record does not suggest that the identification is so unreliable as to create a "substantial likelihood of irreparable misidentification." *Bredy*, 209 F.3d at 1195. To the contrary, most of the facts in the record support the reliability of the identification, and the jury is capable of appropriately weighing any "questionable feature[s]" that remain. *Brathwaite*, 432

U.S. at 116.

Applying the *Biggers* factors, the Court first agrees with the government that Mr. Sharber had an ample opportunity to view his assailant during the shooting. Sharber told the officers during the interview that he saw the gunman "walk up" to him in the parking lot and that the gunman was initially standing "across from [him]" arguing with another person. Gov't Ex. 3 at 7:17–18; 8:15–20. Sharber further explained that he and the gunman exchanged words (which C.G's statement to TFO Ramos appears to corroborate) and that he didn't immediately fall down when the gunman started shooting. *Id*. at 6:20–23; 7:12–15. Finally, TFO Ramos testified that while the parking lot was dark when he arrived due to it being nighttime, the scene was illuminated by streetlights that made it "relatively easy" to see. Tr. 68:18–19.

As to the degree of attention, Mr. Sharber gave the officers a relatively detailed account of the events leading up to the shooting. The fact that Sharber tried to break up a fight just prior to the shooting [Gov't Ex. 3 at 6:7–18], as well as the fact that he spoke to the gunman after he approached [*Id*. at 6:20–23], further suggest that his attention was focused on what was happening in the parking lot. On the other hand, the fact that Sharber told the officers that he had been "smoking a blunt" before the events in question suggests that his perception could have been somewhat impaired by drugs. *Id*. at 6:2–3.

Because the police were unable to obtain a description of the suspect from Mr. Sharber on the night of the shooting, the third *Bigger* factor does not apply. As to the fourth factor, the level of certainty demonstrated at the confrontation, TFO Ramos testified that Mr. Sharber displayed "no hesitation at all" and that there was "no doubt [Sharber] was 100 percent sure that he knew that was who shot him." Tr. 41:12–16. As in *Biggers* and *Natalini*, this factor accordingly weighs in favor of reliability. 409 U.S. at 200; 42 Fed. Appx. at 128. Finally, as to the length of time

between the crime and the confrontation, the Court finds that while more time elapsed in this case than in *Natalini*, the approximate 36-hour gap between the shooting and the identification is still "insufficient to cast doubt upon the reliability of the identification." *Id*. at 128.

Given Mr. Sharber's opportunity to view his assailant directly before and during the shooting, the fact that his attention was focused on the events in question, his reported degree of confidence during the identification, and the relatively short amount of time that elapsed in between the shooting and the confrontation, the *Biggers* factors support the reliability of the identification.

Several other facts also support the reliability of Mr. Sharber's identification, the first of which is his apparent familiarity with Mr. Robertson prior to the shooting. As the government argues, this case does not appear to involve the identification of a total stranger after a random attack. Instead, Mr. Sharber told the police that he had "been knowing" his attacker, SS, "for a while." Gov't Ex. 3 at 4:3–4. Sharber then demonstrated his familiarity with SS by telling the police where he lived, his gang affiliation, and his connection to Angelo Burdex. *Id*. at 11:15–18; 13:3; 15:14–15. The Court acknowledges that the record does not make clear exactly how many times Mr. Sharber had seen Mr. Robertson prior to the shooting nor the depth of their relationship, factors which Dr. Malpass identified as important in weighing the benefits of familiarity. Tr. 147:3–5; 157:16–24. However, Dr. Malpass also admitted that there is no generally accepted number of interactions two people need to have before they recognize each other more easily and accurately, a point brought to life by the fact that prior to the second evidentiary hearing he immediately recognized one of the government attorneys he had only met once before. Cont'd. Tr. at 23:24–24:12; 27:6–8.

Finally, the fact that Ms. Benson also positively identified the photograph of Mr. Robertson

as "SS" [Tr. 24:15–16], whom she said she saw making threats against Mr. Sharber two weeks prior to the shooting [*Id.* at 18:3–9; 19:15–19], and who appears to be connected to Angelo Burdex, the person Mr. Sharber was accused of snitching on [*Id.* at 11:23–12:10], corroborates Sharber's identification of Mr. Robertson and decreases the "likelihood of irreparable misidentification." *Bredy*, 209 F.3d at 1195.

The Court accordingly finds that, under the totality of the circumstances, Mr. Sharber's identification of Mr. Robertson is sufficiently reliable to be admitted at trial despite the suggestiveness of the identification procedures the officers in this case utilized. *Id.* Any questions that remain about the reliability of the identification evidence are for the jury to weigh and consider, *Brathwaite*, 432 U.S. at 116, and Mr. Robertson will be free to challenge it through the other Due Process safeguards of cross-examination, expert testimony, and jury instructions if warranted.

## II.     Rule 403

Nor does Federal Rule of Evidence 403 require the exclusion of the identification evidence. As the government argues, the identification is highly probative because it supports the central charge in the case: that the defendant, Mr. Robertson, shot the victim, Mr. Sharber, on the night of September 12, 2017. *See* Doc. 2. While the probative value of the identification would be diminished if it were "wholly unreliable" as the defense suggests [Doc. 34 at 13–14], the record does not support that assertion. Mr. Robertson has also failed to articulate how the introduction of the identification evidence would unfairly prejudice him by suggesting his guilt on an "improper basis" such as an emotional one. *See Isabella*, 918 F.2d at 837. Because Mr. Robertson has failed to show that the probative value of the identification evidence would be substantially outweighed by unfair prejudice or by another one of the dangers identified in Rule 403, the Court will not

exclude it under Rule 403 at this time.  Fed. R. Evid. 403.

## CONCLUSION

For the foregoing reasons, Defendant Dashawn Robertson's Motion to Suppress Identification Evidence [Doc. 34] is hereby **DENIED**.


ENTERED this 7th day of January, 2020.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE



Charles E. Knoblauch                    Paul Mysliwiec
*Attorney for Mr. Robertson*            Eva M. Fontanez
                                        *Assistant United States Attorneys*