**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

                                     No. 17-CR-02949-MV-1

  v.

DASHAWN ROBERTSON,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on its *sua sponte* Order for Briefing asking the parties to address previously undisclosed promises made and benefits conferred to Natalie Fisher, a key government witness, by Task Force Officer (TFO) Kacy Ramos, an investigating officer and member of the prosecution who considers himself to be the be the government's case agent in this case.[1] Doc. 388. The parties filed supplemental briefs [Docs. 395 and 396] and the Court held an emergency status conference at which it decided to continue Mr. Robertson's previously scheduled trial date in the interests of justice so that the parties could conduct more discovery on this issue and the Court could determine an appropriate sanction for any discovery violations [Doc. 404]. The Court then received testimony and exhibits on the issue at an all-day evidentiary hearing held on May 3, 2021. Doc. 427. Having considered the briefs, exhibits, testimony, relevant law, and being otherwise fully informed, the Court finds that the government violated the Court's November 18, 2020 discovery order by failing to disclose the promises made and benefits

---

[1] At the recent May 3, 2021 evidentiary hearing, one of the prosecutors represented that the case agent in this case is Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Special Agent (SA) Nathan Kempton rather than TFO Ramos. *See* Doc. 429 at 4:15–25. However, TFO Ramos later testified that he believes himself to the be the government's case agent. *Id*. at 7:13–20.

conferred by TFO Ramos to the defense. To remedy this violation, the Court will impose the sanction described below.

<h1 style="text-align:center">BACKGROUND</h1>

This memorandum opinion and order concerns the government's failure to disclose critical impeachment evidence to the defense despite being specifically ordered to do so by the Court. The Court's order on this issue could not have been more clear: it listed specific categories of information the government was required to disclose, including "any promises made or benefits conferred to any of its witnesses," "any promises to write letters of support on behalf of witnesses in prison or facing criminal charges," and "any other promises or conversations that could be viewed as involving a potential benefit to the witness." Doc. 263 at 8. The order clarified that the discovery obligations described therein extended to "any such promises made or benefits conferred by any Assistant United States Attorney; United States Attorney's Office staff member or paralegal; investigator; any local, state, or federal law enforcement officer working on this case; and any other person known to the prosecution working on this case." *Id*. To ensure compliance, the order required the government to "diligently investigate whether any of the individuals listed above made any payments or statements deemed discoverable by [the] order." *Id*. And the order required that the government "conduct such an investigation and produce any such discovery no later than Monday, December 7, 2020 at 5:00 p.m. Mountain Time." *Id*. at 8.

Despite these carefully worded instructions, the government failed to disclose to the defense exactly the kind of critical impeachment information that was at the heart of the Court's order: promises made and benefits conferred to a key government witness by an officer working on the government's behalf. In fact, Mr. Robertson only learned about the promises and benefits after the Court granted his last-minute request for a Rule 17(c) subpoena—over the government's

objection. Doc. 321. Had the Court listened to the government instead of the defense and denied the subpoena, Mr. Robertson would have likely walked into trial unaware of the fact that the testimony of a key witness against him was potentially being influenced by the beneficial things the government had promised her and done on her behalf. And had Mr. Robertson been convicted under such unfair circumstances, his conviction would have been ripe for reversal on appeal under *Brady v. Maryland*, 363 U.S. 83 (1963). The discovery violation at issue here is egregious and inexcusable, and it must be sanctioned.

In imposing an appropriate sanction, however, the Court is constrained by the controlling caselaw in the Tenth Circuit, which focuses on the existence of bad faith and the degree to which the defendant has been prejudiced. *See, e.g., United States v. Gonzales*, 164 F.3d 1285 (10th Cir. 1999) (reversing this Court's imposition of an exclusionary discovery sanction as "too severe" and remanding for consideration of "less severe sanctions"). While the government's actions here were grossly negligent, the Court cannot say that they involved deliberate bad faith on the current record. And while the government's failure to comply with its discovery obligations required the Court to order a continuance that Mr. Robertson did not want or request, he has failed to articulate exactly what prejudice he continues to suffer as a result of the nondisclosure. For these reasons, the Court cannot exclude Natalie Fisher as a witness, as Mr. Robertson requests. Doc. 396 at 1. It will, however, give the curative jury instruction described below to sanction the government's failure to comply with its November 18, 2020 discovery order.

## I.     Procedural History

Mr. Robertson is charged in a three-count superseding indictment with Obstruction of Justice by Retaliating Against a Witness, Victim, or Informant, in violation of 18 U.S.C. § 1513(a)(1)(B); Possessing and Discharging a Firearm in Furtherance of a Crime of Violence, in

violation of 18 U.S.C. § 924(c); and Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924. Doc. 86. The charges arise from his alleged act of shooting an individual named D.S. eight times in the early morning hours of September 12, 2017 in retaliation for D.S.'s cooperation with the federal government in a criminal case in which he was a defendant two years earlier. *See* Doc. 38 at 2. Mr. Robertson pled not guilty to the charges at an arraignment held on December 11, 2017 [Doc. 9] and a trial in the case is set for May 17, 2021.

## II.     Mr. Robertson's Motion for Order Compelling Specific Discovery [Doc. 219], the Court's Resulting Discovery Order [Doc. 263], and the Government's Representations in Court

On October 28, 2020, Mr. Robertson filed a Motion for Order Compelling Specific Discovery. Doc. 219. In the motion, he asked the Court to issue an order under *Brady*, *Giglio v. United States*, 405 U.S. 150 (1972), *Kyles v. Whitley*, 514 U.S. 419 (1995), and Rule 16 of the Federal Rules of Criminal Procedure requiring the government to disclose "[a]ll documentation and records of compensation and benefits paid to any government/cooperating witness, including but not limited to monies paid, promises of financial reward to the witness or family and any threats made to witnesses or family." Doc. 219 at 1. The Court then discussed the motion with the parties at a hearing on November 12, 2020. The official transcript from the hearing contains the following exchange:

> **Court:** Okay. The next thing I have is the Defendant's motion to compel specific discovery. Now, I've read the–all of these pleadings, and I'm not requiring the Government to disclose where any witnesses are, but the Government is required to indicate whether it has made any monetary compensation. Obviously, all witnesses are paid for travel. Defense witnesses, just like Government witnesses, are paid for travel. Defense witnesses, just like Government witnesses, are paid per diem. So both witnesses—both the Government and the defense are going to have to disclose the same type of information.
>
> I think what we're talking about here—in addition to that, which will have to be disclosed by both sides, in addition to that, we're talking about more than that. We're talking about whether the Government has paid any of its witnesses anything

above normal travel and reimbursement for expenses and per diem. We're also talking about whether there have been any promises of leniency with regard to a sentence that is being served or a sentence to be served. We're both—all of us are aware of what exactly is being discussed here. We have an individual who's in custody. Are any promises made to that individual with regard to any leniency, any shortening of that sentence? These are all questions that are legitimate questions of biases that are entitled to be cross-examined by the defense for purposes of bias and impeachment.

So that's exactly what we're talking about. I think we all know what that is. The defense is not entitled to know where any of the other witnesses who are not incarcerated are, and that is not what's being requested here. And they're not entitled to know that. So any questions with regard to that motion? The Court intends to grant that motion with those provisos.

**AUSA Mysliwiec**: Could we get a date for which the defense has to disclose the compensation information for their witnesses?

**Court**: It will be on the same date that the Government—that I will order that the Government is to disclose its information.

**AUSA Mysliwiec**: Excellent, thank you. The answer, by the way, to the question is no. There have been no payments to any of the Government witnesses beyond the statutorily-required flying them here if they're [somewhere] else and the per diem that's required by statute, et cetera. And there also have been no promises of leniency, though there have—as the Court is aware and as really, I mean, everybody here who's a lawyer is aware, there is a possibility of a 5K1.1 motion under the U.S. Guidelines and possibly even a 3553(e) motion. It's not been promised, but it's possible. And the form to which–the possibility has been raised is a plea addendum that has been disclosed to the defense. So there is no undisclosed possibility.

**Court**: And this is for whom? For Natalie Fisher?

**AUSA Mysliwiec**: No. She is under the jurisdiction of, I think, the State of Iowa. We don't have any interaction with that. I might—I mean, if she testifies truthfully, I might write a nice letter to somebody, but we haven't yet and we haven't promised to.

**Court**: Have you discussed that with Natalie Fisher?

**AUSA Mysliwiec**: I haven't. Ms. Fontanez?

**AUSA Fontanez**: No, Your Honor. I have not made any promises to her, nor have we provided her any money or any monetary thing at this point. I want to make sure that it's clear …

**Court:** You can go ahead and sit down, that way I can hear you better. Just move your microphone closer to you.

**AUSA Fontanez**: I'm sorry, Judge. We have not provided any compensation, money, monetary promises. I have not promised to write a letter, nor has the case agent, to Ms. Fisher. At this point, we've not given her anything, nor did we give her per diem for—when we met with her prior to her proffered testimony.

**Court**: Has the case agent advised her that it is possible that if she cooperates with the Government, that your office may contact the law enforcement or the U.S. Attorney's or the District Attorney's office in her district, a letter from your office indicating that she was extremely cooperative or cooperative with this district?

**AUSA Fontanez**: No, not that I'm aware of.

**Court**: Okay.

**AUSA Fontanez**: I will double-check that this afternoon, but, no, not based on my understanding.

**Court**: Okay. So she has not been advised, to your understanding, by you or by your case agent, that there is a possibility of a reduction in her sentence based upon her cooperation in this case?

**AUSA Fontanez**: Correct.

Doc. 283 at 17–20.

On November 18, 2020, the Court filed a nine-page memorandum opinion and order

granting Mr. Robertson's motion in part. Doc. 263. It noted that, in response to its questioning at

the November 12, 2020 hearing

> the government represented that it has not made any promises or offers of monetary compensation to Natalie Fisher or its confidential informant witnesses. Doc. 254 at 4. The government additionally represented that it has not offered to write Ms. Fisher a letter of support and that it is unaware of any such promises made by its case agent. *Id*. At the Court's instruction, the government agreed to check with its case agent to ensure that any promises made to its witnesses have been disclosed. *Id*.

Doc. 263 at 3. After reviewing the relevant law, the Court found that this information was

"discoverable under *Brady* and its progeny, including *Giglio* and *Bagley*, because it is relevant

impeachment evidence that can be used to expose potential sources of witness bias." *Id*. at 5. The Court indicated that it would therefore order the government "to disclose any such information, including any promises made to its witnesses by **any of the law enforcement officers working on this case**, because promises that they made would be within the government's constructive knowledge or possession." *Id*. at 5–6 (emphasis in original). Later, to ensure that the government complied with its discovery obligations in this area, the Court issued the following highly specific orders:

> 2. The government is required … to disclose to the defense any monetary payments or offers of financial benefit made to any of its witnesses by any Assistant United States Attorney; United States Attorney's Office staff member or paralegal; investigator; any local, state, or federal law enforcement officer working on this case; and any other person known to the prosecution working on this case. The information to be disclosed includes any payments for travel, lodging, food, and statutorily required witness attendance fees, as well as any payments in addition to those amounts. The government is *not* required to disclose any identifying details regarding its witnesses' travel arrangements or where they will be staying in New Mexico; this paragraph only applies to amounts paid, promised, or arranged.

> 3. The government is also required to disclose to the defense any promises made or benefits conferred to any of its witnesses, including benefits that would potentially reduce the sentences or prison terms of its incarcerated witnesses. This includes, but is not limited to, any promises to write letters of support on behalf of witnesses in prison or facing criminal charges; any promises of non-prosecution; any promises with regard to its witnesses' conditions of confinement; and any other promises or conversations that could be viewed as involving a potential benefit to the witness. The discovery obligations in this paragraph extend to any such promises made or benefits conferred by any Assistant United States Attorney; United States Attorney's Office staff member or paralegal; investigator; any local, state, or federal law enforcement officer working on this case; and any other person known to the prosecution working on this case.

> 4. To ensure compliance with the above provisions, the government is **ORDERED** to diligently investigate whether any of the individuals listed above made any payments or statements deemed discoverable by this order.

> 5. The government shall conduct such an investigation and produce any such discovery **no later than Monday, December 7, 2020 at 5:00 p.m. Mountain Time.** This deadline is meant to ensure that the defense receives any responsive information early enough to prepare an effective defense at trial, and the deadline

> will *not* be extended based on any additional trial continuances. The government will also be required to continue to disclose any responsive information received past the above deadline **as soon as it is known** to the Assistant United States Attorneys of record in this case.

Doc. 236 at 8.

This issue next came up at a subsequent hearing on February 4, 2021 after defense counsel advised the Court that the government had not disclosed the results of its discussions with its case agent and other investigative officers until the night before (February 3, 2021) when it represented in an email that "to their knowledge, no promises were made." Doc. 386 at 173:9–10 (Transcript of February 4, 2021 Hearing). Defense counsel continued that she "just wanted to confirm that that is the case, that we don't have any promises, especially given that Ms. Fisher is out of custody and seems to have been paroled at a very much faster [rate] than her parole date had been disclosed to us. So we just want to make sure that there were no promises or benefits conferred to Ms. Fisher or to any of the other civilian witnesses." *Id*. at 173:11–16. In response, AUSA Mysliwiec stated "Yeah, no change since 11:24 p.m. last night." *Id*. at 173:17–18. AUSA Mysliwiec continued that he had not yet provided Ms. Fisher a letter and that he did not exercise power over the "state government of Iowa" nor had he "done anything for Natalie Fisher in that regard." *Id*. at 174:3–7 He then stated

> immediately upon getting out of that last hearing, Ms. Fontanez wrote the detectives, Detective Ramos and Special Agent Kempton, and asked if they had given any assurances or promises or like pre-promises to any of our witnesses. And the detectives timely answered, No, we have not. … But Ms. Fontanez asked immediately upon getting out of that last hearing, and we got an answer very quickly, no, those detectives did not make any promises.

*Id*. at 174:14–24. AUSA Fontanez then added: "Judge, just to elaborate on that. Our case agent went further. He actually contacted—because he said what if there's something implied or anything. He asked Ms. Fisher if we've made any promises to her of any kind, and she said no."

*Id*. at 175:1–5.  The Court responded, "Okay.  Thank you so much."  *Id*. at 175:6.

### III.    Mr. Robertson's Rule 17(c) Subpoena [Doc. 307], the Responsive Records, and the Court's Order for Briefing [Doc. 388]

On February 5, 2021, the Court continued Mr. Robertson's previously scheduled trial date to April 5, 2021.  Doc. 304.  Five days later, on February 10, 2021, Mr. Robertson filed a motion for Rule 17(c) subpoenas seeking information on several incarcerated or previously incarcerated witnesses, including Natalie Fisher.  Doc. 307.  The proposed subpoenas sought several categories of information including recorded jail calls.  *Id*.  Mr. Robertson explained that "[t]he records requested by subpoena relating to Ms. Fisher's and Mr. Loera's jail records will likely reveal conversations they have had with friends and family members about their cooperation with the government, their expectations for cooperating, and confirm whether either witness has received any benefits for their cooperation. Mr. Robertson is entitled to review their prison records to determine whether either has received benefits in the form of money, transfers, property, or additional privileges that coincide with their cooperation.  Information contained in their jail records, including jail calls, is likely to reveal how, and more importantly, why each witness is cooperating."  *Id*. at 8.  After the government indicated its intent to file a response in opposition to the subpoena request, the Court ordered it to brief whether it had standing to do so.  In that brief, in addition to making arguments about standing, the government argued that the Court should deny the subpoena request because it contained no more than "conjecture as to [the] contents" of the communications sought.  Doc. 318 at 13 (citation omitted).  The government also pointed out that "[t]he Court already conducted extensive inquiry on the record about promises offered to those two witnesses, and learned conclusively that there have been none."  *Id*.  The Court ultimately overruled the government's objections and approved the subpoenas on February 19, 2021.  Doc. 321.  In so doing, the Court noted while the government has represented that "neither it nor its

agents have made any promises to Ms. Fisher in exchange for her testimony … the authorities in Iowa could have made separate promises or conferred benefits that the federal prosecutors in this case are not aware of." *Id*. at 10. The Court also noted that the requested information could shed light on the nature of Ms. Fisher's release from prison shortly after she testified in this case in October 2020. *Id*.

On March 17, 2021, the Court received responsive materials from the Iowa Department of Corrections (DOC), including recordings of Ms. Fisher's phone calls from prison. The Court promptly provided the parties access to electronic copies of the responsive materials. In subsequently reviewing the materials, the Court noticed several concerning phone calls from June, July, and August 2020 between Ms. Fisher and a person that appeared to be TFO Ramos calling from a New Mexico phone number with the digits 933. In some of the calls, TFO Ramos agreed to help Ms. Fisher by contacting government attorneys in Iowa on her behalf about a no-contact order between her and her son. Doc. 428 at 2. Eventually, TFO Ramos told Ms. Fisher that the no-contact order was going to be lifted. *Id*. In other calls, TFO Ramos told Ms. Fisher that he had spoken to the prosecuting attorneys on this case about writing her a favorable letter to the Iowa Parole Board and that they were willing to do so. *Id*. After discovering these calls, the Court filed an order for briefing[2] on March 23, 2021 in which it expressed concern that the calls, "which appear to have taken place several months before Mr. Robertson's motion to compel discovery in October 2020, could be viewed as directly contradicting the prosecutors' subsequent representations to the Court and defense counsel that neither they nor their investigating agents ever made promises or conferred benefits to Natalie Fisher." Doc. 388 at 9. The Court was also

---

[2] The Court initially filed the order under seal but later unsealed it, as well as Docs. 395, 396, and 404, on motion by Mr. Robertson. *See* Doc. 428.

concerned that "the government failed to discover and/or disclose these potential benefits and promises after being explicitly ordered to do so by the Court orally and in writing, and that this information was only disclosed to the defense by virtue of a Rule 17(c) subpoena that the government opposed." *Id*. at 9–10. As a result, it ordered the parties to submit supplemental briefing by the next day on a number of questions, including whether the prosecuting attorneys on the case were aware of TFO Ramos's statements to Ms. Fisher; whether anyone on the prosecution team wrote a letter on her behalf to the Iowa Parole Board; whether the government's failure to disclose this information constituted a *Brady* violation; and, if so, what the appropriate sanction should be. *Id*. at 10–11.

### IV.    The Parties' Supplemental Briefs [Docs. 395 and 396]

The government responded first. Doc. 395. In a twenty-two–page brief filed on March 24, 2021, it confirmed that the calls in question involve TFO Ramos speaking to Natalie Fisher. *Id*. at 1. The government then reviewed the contents of specific calls. In one call from July 8, 2020, it quoted TFO Ramos as making the following statements in response to the fact that Ms. Fisher had recently been denied parole:

> Well that really sucks, but the good news is, well, I mean I don't know if it will change anything now, but we'll have the US Attorney letter write for you, and we will see about how cooperative you have been and shown responsibility and maybe that will hasten things up for you. They've already said they're willing to do that – the US Attorney's office … give me like a day or so, and I'll start looking into it right now and hopefully I'll have a better answer for you. And I'll send an email to your counselor to see who we have to send a letter to. Do you all have, like, a parole board? … I'll send them a letter now from us saying how cooperative you've been and then the US Attorney will probably wait until after you testify, but they already said they'd write you a letter so, I don't know if that changes anything for the next three months, but we'll do what we can for sure.

Doc. 395 at 4. The government next recounted a call from two days later, July, 10, 2020, in which TFO Ramos stated: "I talked to the US Attorney and they are ok with writing you a letter saying

how cooperative you've been, so I don't know how much it'll help but at least you'll have a US Attorney and a Special Agent telling people at your prison that you've been super cooperative … so, hopefully it'll help you." *Id*. The government conceded that these calls were "promises to benefit the witness that the Court's order required the prosecutors to learn of and disclose by December 7, 2020." *Id*.

With regard to Ms. Fisher's no-contact order with her son, the government recounted several pertinent phone calls from July 2020 in which TFO Ramos told Ms. Fisher he would help her with the order and then subsequently let her know he was communicating with attorneys in Iowa about it. *Id*. at 4–5. Eventually, in a call from July 23, 2020, TFO Ramos told Ms. Fisher that the no-contact order was being dismissed that day and that he would send her the paperwork. *Id*. at 6. The government represented that "TFO Ramos did not ask anyone to dismiss Ms. Fisher's case or drop the protective order against her" and it characterizes his actions as "investigative efforts to find out what was going on with the protective order." *Id*. at 6. The government nevertheless took the position that "even TFO Ramos's efforts to inquire about the order and get her paperwork confirming its dismissal, even if he did nothing to change its status, were a benefit conferred upon Ms. Fisher that the undersigned prosecutors were required to have disclosed earlier under the Court's order." *Id*. at 4. The government concluded this section of its response by acknowledging that there are other potential benefits as well, such as information TFO Ramos presented to Ms. Fisher about the legal situation of Tevin King, and some food the government bought for Ms. Fisher during witness prep. *Id*. at 7.

Next, the government represented that it was "not aware of TFO Ramos' promise to write favorable letters to the parole board or otherwise to assist her in getting released *earlier* from custody." *Id*. at 8. It added that neither he nor anyone else on the prosecution team wrote such a

letter.  *Id*.  The government stated that while TFO Ramos said on July 8, 2020 "I'll send them a letter now from us saying how cooperative you've been,"

> what TFO Ramos meant was that he would speak up for Ms. Fisher the next time the parole board considered her fate, which was expected to be approximately three months later.  Because she was released from custody before alerting TFO Ramos that that later review was occurring, he never made good on his promise to write the letter.

*Id*. at 8–9.  The government similarly represented that "[t]he undersigned Assistant United States Attorneys did not know about TFO Ramos' inquiries into the no-contact order or his follow-up to make sure Ms. Fisher had the paperwork showing it had been dismissed."  *Id*. at 9–10.

For support, the government attached to its response an email conversation between AUSA Fontanez and TFO Ramos from November 2020 that was subsequently admitted as Government's Exhibit 1.  Gov't Ex. 1.  The email conversation shows that AUSA Fontanez informed TFO Ramos on November 24, 2020 that "[t]he Court ordered me to check with you and make sure you have not made any promises to Natalie of any kind, including to write a favorable letter for her.  Will you please review the attached order and please confirm that we have not made any promises to Ms. Fisher."  *Id*. at 2.  There is then another email from November 30, 2020 in which AUSA Fontanez wrote to TFO Ramos: "This email is to confirm per our conversation that you have not made any promises to Ms. Fisher.  It [is] my understanding that you have not made any promises to Ms. Fisher.  In addition, in the abundance of caution, you recently contacted Ms. Fisher and she agrees that we have not made any promises to her."  *Id*. at 1. TFO Ramos then replied, "The statements are all accurate.  Thanks."  *Id*.

The government then discussed the law and potential sanctions.  It submitted that while the non-disclosure of these calls violated the Court's November 18, 2020 discovery order, there has been no violation of *Brady* because "an essential component of the *Brady* analysis is prejudice to

the outcome at trial." *Id*. at 11. The government argued that the calls have been disclosed in time for their effective use at trial, and that the Court can "prevent any *Brady* claim from ripening by granting a continuance sufficient to dispel the concern." *Id*. at 12. The government continued that further discovery via subpoenas would be appropriate and that the Court could hold an evidentiary hearing to hear from TFO Ramos. *Id*. at 13. The government rejected any remedy stronger than a continuance, however. It pointed to caselaw from the Tenth Circuit characterizing the exclusion of a witness as "obviously the most severe available sanction" and other caselaw stating that "the preferred sanction is a continuance." *Id.* at 15. Finally, the government submitted that what happened here was negligence, and not bad faith, and that Mr. Robertson has not suffered much prejudice because he will be able to cross-examine Ms. Fisher on the promises and benefits conferred. *Id*. at 19.

Mr. Robertson also filed a response on March 24, 2021. Doc. 396. He argued that the government has again violated *Brady*, this time "in direct contravention of a specific defense request for discovery" and it has "materially misled the Court about whether this *Brady* information existed." *Id*. He continued that "[t]he only appropriate remedy for this violation is to prohibit Natalie Fisher's testimony in its entirety." *Id*. Mr. Robertson then discussed the applicable law. He quoted the Tenth Circuit for the proposition that knowledge by police or investigators is imputed to the prosecution. *Id*. at 6. He also quoted caselaw discussing the fact that while the *Brady* analysis usually addresses evidence disclosed *after* trial, the analysis can also be applied to the pretrial period if the government's dilatory disclosure prejudiced the defense. *Id*. He advocated for a harsh sanction because the government never disclosed this material to the defense and there is "clear evidence of bad faith as the defense specifically requested this material by written motion and twice in open court, and the prosecution told the Court it did not exist." *Id*.

## V. The Emergency Status Conference [Doc. 404] and Mr. Robertson's Recent Rule 17(c) Subpoenas

Given the impending April 5, 2021 trial date, after receiving the parties' supplemental briefs the Court held an emergency status conference with them on March 26, 2021. Doc. 404. The Court explained that it did not have enough information to exclude Natalie Fisher as a witness, as Mr. Robertson had requested. Doc. 404 at 2. It nevertheless expressed its concern over the apparent discovery violation and explained that it needed more information to determine what, if any, the appropriate sanction should be. *Id*. Both parties indicated that they were not asking for a continuance, but the defense stated that it would be in favor of a short continuance if the Court was not ready on the present record to exclude Ms. Fisher. *Id*. at 3. The Court then continued the trial date to May 17, 2021 in the interests of justice to allow further discovery on this issue. *Id*. at 4; *see also* Doc. 403. In the meantime, it encouraged the parties to file all necessary subpoenas as soon as possible. Doc. 404 at 3.

Following the status conference, the Court granted Mr. Robertson's requests for a number of subpoenas under Rule 17(c) of the Federal Rules of Criminal Procedure, including a subpoena to the Iowa Parole Board [Doc. 405], a subpoena to the Iowa Department of Human Services (DHS) [*id*], subpoenas to the Albuquerque Police Department (APD) and the ATF for TFO Ramos's communications [Docs. 405 and 407], and an *ex parte* subpoena to a county prosecutor in Iowa who worked on the dismissal of Ms. Fisher's no-contact order [Doc. 415].

## VI. The May 3, 2021 Evidentiary Hearing [Doc. 427]

The Court then held an evidentiary hearing on the issue on May 3, 2021, at which it received exhibits from the parties and heard testimony from several witnesses. Doc. 427.[3]

---

[3] In total, the evidentiary hearing lasted almost eight hours on the record and generated a 290-page transcript. The Court has carefully reviewed the transcript and the exhibits submitted by the parties. For the sake of concision, its discussion below will focus on the parts of the hearing that most directly bear on

### A. Testimony of TFO Ramos

The defense first called TFO Ramos to the stand.  He testified that he began his career in law enforcement in 2007 when he was hired by the APD.  Doc. 429 at 7:25–8:6.  He received training on disclosing exculpatory information to the defense during a "law block" at the police academy [*id*. at 8:13–23] and was aware prior to this case that he has an obligation to disclose promises he has made or benefits he has conferred [*id*. at 9:23–10:4].  TFO Ramos continued that he received the Court's November 18, 2020 discovery order from AUSA Fontanez and knew as of the date of the order that the government was being required to disclose any promises made to Ms. Fisher, including promises to write letters on her behalf.  *Id*. at 11:15–14:12.  TFO Ramos then testified about what he did in response to the Court's order, stating

> I sat down, I looked at the case file, I looked at my notes, I checked in my emails to ensure that I had not made any promises.  I took several hours.  I just sat down and I thought about it.  This case has spanned a very long time.  There was many conversations with many people.  So I sat down, I thought about it.  I contacted Ms. Fontanez and I told her I didn't remember making any promises but this was a long case, and I couldn't remember everything that occurred.

*Id*. at 17:12–19.  AUSA Fontanez then told TFO Ramos to contact Ms. Fisher "just to be safe" to "make sure that she did not feel that [he] provided any promises or benefits in order to make her testify."  *Id*. at 17:20–23.  TFO Ramos testified that as a result, he called Ms. Fisher and asked her "At any point, have I made you feel that, in order to get you to testify, I promised you anything or made any benefits to you?"  *Id*. at 17:23–18:1.  In response, Ms. Fisher reportedly said that "she had decided to do this on her own, and nothing [TFO Ramos] did compelled her to give testimony or to continue giving testimony."  *Id*. at 18:17–18.  TFO Ramos was the only person on the call with Ms. Fisher and he did not have a colleague reach out to her in his place.  *Id*. at 19:1–19.  Later, TFO Ramos reiterated that "[t]he point of the call was to make sure that Natalie did not feel that I

---

the issues at stake in this opinion.

made her promises or benefits in order for her to testify or continue to testify. That was the point I believe I got across in the call to Ms. Fisher." *Id*. at 20:6–9. However, TFO Ramos could not "remember specifically" whether he directly asked Ms. Fisher "Have I ever made you promises?" *Id*. at 20:13–16. He also testified that he did not ask Ms. Fisher about any specific instances where promises may have been made and he did not try to prompt her on any things that happened in the past to refresh her memory. *Id*. at 27:4–19. It was a "very quick" phone call that lasted "one or two minute[s]." *Id*. at 27:19–20.

Defense counsel then asked TFO Ramos about a conversation he had with Ms. Fisher on September 14, 2017 shortly after the shooting in this case. *Id*. at 20:21–25. To refresh TFO Ramos's recollection, the defense played a video recording of the encounter from his body camera. *Id*. at 21:18–20. During the encounter, TFO Ramos approached Ms. Fisher at an apartment and told her that she had a misdemeanor warrant but he was willing to let it go if she spoke with him. *Id*. at 23:11–21. He testified that it is common in Albuquerque for the police to let people take care of misdemeanor warrants themselves, and that his comment to Ms. Fisher was "not in order to get her to give me a statement." *Id*. at 23:13–18. Later in the encounter, however, TFO Ramos told Ms. Fisher "I will let you walk on a stupid misdemeanor warrant, but we need to talk about other stuff." *Id*. at 24:5–8. He also told Ms. Fisher something to the effect of "[Y]ou can do this quickly or we can just book you for the warrant." *Id*. at 24:17–20. Ms. Fisher was then placed in handcuffs and led to a police car. *Id*. at 25:7–26:13. She was never booked on the misdemeanor warrant. *Id*. at 27:2–3.

Next, defense counsel asked TFO Ramos about a number of the recorded prison calls between himself and Ms. Fisher that had recently been disclosed as a result of the defense's opposed Rule 17(c) subpoena. The calls were admitted into evidence as Defendant's Exhibits A–

M. *Id*. at 36:2–3. In one call from June 22, 2020, TFO Ramos told Ms. Fisher that they could go shopping or take care of her clothes for trial. *Id*. at 37:15–23. He also told her that he could just give her money instead. *Id*. TFO Ramos testified that he did not tell AUSA Fontanez about this phone call when she asked about promises and benefits because "at this specific time I told Ms. Fontanez that, I did not remember this specific phone call" and "at the time we had this conversation, I did not remember this specific call." *Id*. at 38:13–18. In another call from July 10, 2020, TFO Ramos offered to give Ms. Fisher money if she did not have enough to call him. *Id*. at 40:6–12. He did not tell anyone on the case about that call. *Id*. at 41:23–42:7. And in another call from July 8, 2020, TFO Ramos told Ms. Fisher that he was trying to get her ex-boyfriend a reward for helping him with a cell phone. *Id*. at 46:2–24. The reward came from the ATF and TFO Ramos specifically discussed it with the prosecutors in this case. *Id*. at 46:22–47:20.

Defense counsel then asked TFO Ramos about his promises to write letters on Ms. Fisher's behalf. He confirmed that in the call from July 8, 2020, he told Ms. Fisher in response to the news that her parole had been denied that the United States Attorney's Office would "letter write" for her. *Id*. at 48:12–17. Later in the call, TFO Ramos elaborated that the United States Attorney's Office had already agreed to write a letter and he would send a letter to Ms. Fisher's counselor "now." *Id*. at 53:15–222. TFO Ramos then testified that he had a conversation with someone from the United States Attorney's Office about writing Ms. Fisher a letter. *Id*. at 48:23–49:2. Specifically, he testified

> I had a conversation with one of the U.S. Attorneys, and in that conversation, we were discussing the good moral conduct that Natalie had showed up to this point. She was in a very difficult position. She had been contacted by Mr. Robertson. She had been threatened over testifying. She had been harassed at the prison over testifying, and we were talking about that. One of the U.S. Attorneys told me that if Natalie testified truthfully, they would write a letter or think about writing a letter on her behalf.

> However, that was a conversation between me and that U.S. Attorney. It was never–the letter was never offered. It was my fault that I went to Natalie and told her that. It was never the U.S. Attorney's Office saying, "Go tell her we'll write her a letter." I jumped the gun on that, and I acknowledge it was a mistake, something I shouldn't have done. At the time she was upset because she had received three more months in prison, and that's why I was trying to encourage her, but it's something that I should not have said.

*Id*. at 49:15–50:6. TFO Ramos then clarified that the AUSA involved in that conversation was AUSA Mysliwiec, and that the conversation "had to have been before" he mentioned the possibility of a letter to Ms. Fisher because "that's why I remember mentioning it to her." *Id*. at 50:7–14. TFO Ramos continued that AUSA Mysliwiec "did not tell me to tell Ms. Fisher that. He did not say 'Tell her I'll write a letter.' It was something I said on my side that I should not have said and jumped the gun and told her that. In context, I thought that this trial was going to happen in the fall, and I thought that Ms. Fisher would have already testified before–before she was eligible for release from prison. But, again, I acknowledge I should not have said that." *Id*. at 51:10–17. When subsequently asked if he planned to tell the defense about the conversation before the fall trial, TFO Ramos responded "[w]hen I told Ms. Fisher I didn't make her any promises or benefits, I have no specific memory of this conversation. I've never tried to hide anything from you, I've never tried to hide anything from the Court, nor the U.S. Attorney's office. I've made mistakes. I acknowledge that. I take responsibility for those. But I can tell you without reservation that I've never intentionally hid anything nor lied to the Court." *Id*. at 51:20–52:1.

Defense counsel then played a call from July 10, 2020, two days after the July 8, 2020 call, in which TFO Ramos brought up the favorable letter again and told Ms. Fisher that he had spoken with the United States attorneys and they were ok with writing her a letter. *Id*. at 58:7–25. In response, TFO Ramos did not deny making the statement but explained that it was a "liberty [he] took in the conversation" that he "shouldn't have." *Id*. at 58:24–59:4.

Turning to the issue of Ms. Fisher's no-contact order, TFO Ramos acknowledged that in response to Ms. Fisher's request for help with the order, he told her on July 8, 2020 "I can definitely help you." *Id*. at 60:9–11. He nevertheless testified that he did not intend to get the order dropped; he was only "going to look in to see if it still existed." *Id*. at 60:18–19. Then, on July 10, 2020, TFO Ramos told Ms. Fisher something to the effect of "We're still working on the documents we need–that you'll need to file to get back in your son's life." *Id*. at 62:5–9. TFO Ramos also testified about conversations he had with the prosecutor on Ms. Fisher's criminal case in Iowa, Tracie Sehnert. *Id*. at 64:1–64:5. He testified that Ms. Sehnert told him the no-contact order should have already been lifted because Ms. Fisher's criminal case was over. *Id*. at 64:15–22. TFO Ramos also testified "I did not ask her to drop the protection order. I simply asked her what the status of it was. I never asked her to drop it on behalf of me or Natalie." *Id*. at 64:24–65:1. After several additional phone calls in which Ms. Fisher asked TFO Ramos about the status of the order, TFO Ramos advised her on July 23, 2020 that attorneys with the Iowa DHS were moving to dismiss the no-contact order in court. Def. Ex. J. TFO Ramos made that statement after Ms. Senhert sent him an email the previous day indicating that the order would be dismissed by a coworker. Hearing Tr. at 70:11–24. Later, TFO Ramos testified that he believes one of the Iowa attorneys also sent him a copy of the dismissal paperwork via email, although he never provided that paperwork to the prosecuting attorneys. *Id*. at 75:2–76:19.

The government then conducted cross-examination of TFO Ramos. He testified that he has been a TFO with the ATF since January 2018 and that, unlike special agents, TFOs do not go to the federal academy or receive training on *Brady* or *Giglio*. *Id*. at 87:2–25. He reiterated that because he could not remember any specific promises or benefits to Ms. Fisher, he and AUSA Fontanez came to the conclusion that he should "call Natalie and make sure that nothing that [he]

did made her feel that–that nothing that [he] did made her feel that [he] gave her promises or benefits in order to testify or to participate in this case." *Id*. at 95:12–21. After that conversation with Ms. Fisher, TFO Ramos testified that he called AUSA Fontanez and told her "I couldn't remember every call or every time I talked to a witness in this case, but I felt that was the best answer at the time. I felt that was the honest answer at the time. I didn't feel. I knew it was." *Id*. at 98:15–19. When TFO Ramos subsequently emailed AUSA Fontanez to confirm that no promises had been made, he was thinking "I had done my due diligence at that point. I checked every document that I had access to." *Id*. at 99:12–13. He later testified he did not take notes during any of his conversations with Ms. Fisher but that he would take better notes going forward. *Id*. at 117:15–22.

The government then reviewed several exhibits with TFO Ramos, including documents from the Iowa Parole Board. *See* Gov't Exs. 2, 3, 4, 5. Based on the exhibits, TFO Ramos testified that the Parole Board does not conduct in-person hearings; that Ms. Fisher was denied parole on June 22, 2020 but was up for reconsideration in three months; that Ms. Fisher completed a class called Achieving Change Through Value-Based Behaviors by August 2020; and that Ms. Fisher was ultimately granted parole on October 8, 2020. *Id*. at 120:5–124:11. TFO Ramos also testified that he never wrote Ms. Fisher a letter to the parole board. *Id*. at 127:11–12. On the no-contact order, TFO Ramos testified that he "contacted Natalie's dad and asked … which DHS person was assigned to the case." *Id*. at 129:2–3. TFO Ramos then got that information, contacted a person named Chelsey Yanders, sent Ms. Yanders an email, and had a phone conversation with her, at which point he was referred to another attorney in Iowa, Ms. Senhert. *Id*. at 129:5–7. TFO Ramos then emailed "back and forth" with Ms. Senhert and had a phone conversation with her. *Id*. at 129:7–9. TFO Ramos then reiterated that he was only looking into the no-contact order "to see if

it was still valid." *Id*. at 138:8.

On re-direct, TFO Ramos testified that at no time did anyone from the United States Attorney's office sit him down and discuss the rules for turning over exculpatory information or complying with *Brady*. Doc. 155 at 2–9. He also testified that he did not believe he had conveyed to Ms. Senhert the message that he was hoping to get Ms. Fisher's no-contact order dropped. *Id*. at 160:11–14.

### B. Testimony of Elijah Lane

The defense's next witness was Elijah Lane. *Id*. at 163:23. Mr. Lane testified about a conversation he had with TFO Ramos in which TFO Ramos reportedly offered him money if he agreed to testify in this case. *Id*. at 164:19–23. On cross-examination, however, it became clear that TFO Ramos's statements to Mr. Lane could have been referring to witness attendance fees or reimbursement for mileage. *Id*. at 193:3–9. The Court accordingly advised the parties that it did not intend to consider Mr. Lane's testimony in its consideration of the issues at hand. *Id*. at 192:24–193:2.

### C. Testimony of Tracie Sehnert

Next, the defense called Tracie Sehnert, an Assistant County Attorney at the Warren County Attorney's Office. *Id*. at 195:3–8. Ms. Sehnert testified about Defendant's Exhibit T, an email she sent on July 22, 2020 to Eric Anderson, another attorney in the office who handles criminal cases relating to child endangerment. *Id*. at 198:21–199:4. In the email, Ms. Senhert advised Mr. Anderson that she entered a no-contact order (NCO) in Ms. Fisher's child-endangerment case. *Id*. at 200:11–21. She then wrote "[t]he child was adopted and we closed the case. The prison will not allow visits because there isn't a worker to control the visitation. Kacy Ramos reached out to Chelsey [Yanders] and said that the mom was helping them with an

investigation in Arizona, and he was hoping to get the NCO dropped, so that she can have visits in prison." *Id*. at 200:22–201:2. Ms. Senhert concluded the email by asking Mr. Anderson if he would be willing to dismiss the no-contact order. *Id*. at 201:5–8. She testified that she had a phone conversation with TFO Ramos, and that in the conversation he said that Ms. Fisher "was asking for the no-contact order to be dropped." *Id*. at 201:16–19. Ms. Senhert did not object to the order being dropped because Ms. Fisher's criminal case was done and her parental rights had been terminated. *Id*. at 202:2–5.

On cross-examination, Ms. Senhert reiterated that in her conversation with TFO Ramos, they discussed the fact that Ms. Fisher had wanted to have the no-contact order dropped. *Id*. at 204:1–4. She could not specifically remember if TFO Ramos asked her to drop the order but later stated that she thought "he was calling to say mom would like to have it dropped." *Id*. at 204:14–17, 210:4–5. Ms. Senhert also testified that TFO Ramos's call did not have an effect on the outcome of the order because if someone else had called, she still would have recommended that the order be dropped. *Id*. at 206:6–13.

### D. Testimony of Gary Ainsworth

The next witness at the hearing was Gary Ainsworth, a defense investigator. *Id*. at 211:7–13. Mr. Ainsworth testified that the day before the hearing, he accompanied defense counsel to an interview of Ms. Fisher at her hotel. *Id*. at 211:17–22. When the two arrived at Ms. Fisher's hotel room, she was present with both of the prosecutors on this case as well as SA Kempton. *Id*. at 213:4–10. When defense counsel asked to speak with Ms. Fisher alone, she said something to the effect of she preferred that the prosecution team be there. *Id*. at 213:15–16. The government did not conduct cross-examination of Mr. Ainsworth.

### E.  Testimony of Natalie Fisher

Finally, the defense called Natalie Fisher.  She testified that she met TFO Ramos in 2017 when he arrested her at her apartment following the shooting in this case.  *Id*. at 222:23–223:11.  She was led away in handcuffs, placed in a squad car, and taken to a substation.  *Id*. at 225:4–10.  Ms. Fisher testified that she then spoke to TFO Ramos about the shooting and afterwards he let her go without keeping her in custody on the warrant.  *Id*. at 225:11–19.  On the topic of the no-contact order with her son, Ms. Fisher testified that it was in effect while she was in prison in Iowa and had been in effect for a little over one year.  *Id*. at 232:8–15.  The no-contact order was put in place because Ms. Fisher was charged with child endangerment.  *Id*. at 232: 16–17.  Ms. Fisher testified that when TFO Ramos told her the order was going to be dismissed, she was happy because she would be able to see her son when she got out.  *Id*. at 236:13–18.  A few days after the no-contact order was lifted, on July 26, 2020, Ms. Fisher had a video visit with her son, the first she had while in prison.  *Id*. at 240:13–21.  The video visit was also the first time Ms. Fisher and her son had seen each other in a long time.  *Id*. at 240:25–241:2.  The two had a few additional video visits in August 2020.  *Id*. at 240:22–24.  Later, defense counsel asked Ms. Fisher about her call with TFO Ramos in November 2020 about potential benefits and promises.  *Id*. at 245:22.  In response, she testified "so what he said was, I'm just calling to make sure that you know I'm not offering you any promises.  I'm not helping you with anything."  *Id*. at 245:25–246:2.

On cross-examination, Ms. Fisher testified that when TFO Ramos called her in November 2020, she did not think that he had provided her with any promises or benefits.  *Id*. at 249:24–250:1.  With regard to the recorded prison calls, she testified that when TFO Ramos told her on June 22, 2020 that he would give her money for clothes, she interpreted that to mean he would help her get an outfit for court.  *Id*. at 256:23–257:1.  When he discussed putting money on her

books on calls from July 8, 2020 and August 27, 2020, Ms. Fisher took that to mean that he had "[o]ffered to put money on [her] books just in case [she] needed to call him." *Id.* at 260:12–18. Ms. Fisher also testified that when she was paroled, one of her conditions was that she could not contact her victims and because of the nature of her charge, her son was considered a victim. *Id.* at 262:10–12. She accordingly wrote a letter to the Parole Board stating that she had been sober and was doing well and needed to see her son. *Id.* at 262:13–16. On re-direct, Ms. Fisher clarified that as a result of her letter, the Board changed her conditions of parole to allow her to see her son as long as her father, who had adopted her son, allowed it. *Id.* at 265:13–15.

## DISCUSSION

The Court has reviewed the parties' briefs, the testimony and exhibits from the May 3, 2021 evidentiary hearing, and the relevant law. For the reasons explained below, the Court finds as a preliminary matter that TFO Ramos's testimony at the hearing was not credible. It also finds that while the government's failure to turn over TFO Ramos's promises and benefits to the defense did not violate *Brady* because the caselaw in that area requires a strong showing of prejudice before a nondisclosure by the government ripens into a Due Process violation, the nondisclosure clearly violated the Court's November 18, 2020 discovery order. Finally, the Court finds that while the discovery violation at issue here was egregious and inexcusable, the defense has not established the level of prejudice or bad faith required to warrant an exclusionary sanction. Instead, the Court believes that the most appropriate sanction under the circumstances is a curative jury instruction that informs the jury about the government's violation of the Court's discovery order by failing to disclose the promises and benefits TFO Ramos made and conferred to Natalie Fisher.

### I.   TFO Ramos's Testimony at the May 3, 2021 Evidentiary Hearing Was Not Credible.

As a preliminary matter, the Court carefully watched and listened as TFO Ramos testified

in person at the May 3, 2021 evidentiary hearing for over three hours. *See* Doc. 427 at 2–3. It has also carefully reviewed the transcript of his testimony, that of the other witnesses who testified at the hearing, and the parties' exhibits. For the reasons explained below, the Court concludes that several portions of TFO Ramos's testimony at the evidentiary hearing were not credible.[4]

First, the Court does not find credible TFO Ramos's explanation that he simply could not remember any of the promises and benefits he discussed with Ms. Fisher after AUSA Fontanez emailed him a copy of the Court's discovery order on November 24, 2020 and asked him to confirm that he had "not made any promises to Natalie of any kind, including to write a favorable letter for her." Gov't Ex. 1. The Court comes to this conclusion for several reasons. First, while the Court does not doubt that TFO Ramos has had many conversations with Ms. Fisher since he initially spoke with her following the shooting in this case in September 2017, his phone calls with Ms. Fisher about the favorable letter to the Parole Board and his various phone calls and emails about her no-contact order occurred in July 2020, only five months prior to the Court's order and AUSA Fontanez's email inquiry in November of that year. The topic of Ms. Fisher's parole should have also been fresh in TFO Ramos's mind because Ms. Fisher was granted parole on October 8, 2020, just over one month prior to the Court's discovery order, and TFO Ramos was notified of that fact by Ms. Fisher's prison counselor, Joe Whitlow, via email on the day it occurred. *See* Gov't Ex. 6. In response, TFO Ramos wrote: "Great to hear! I'll keep in touch to make sure I know how to contact Natalie. Thanks Joe." *Id.*

---

[4] In its closing argument at the hearing, the government "implore[d]" the Court not to make an adverse credibility finding against TFO Ramos in part because such a finding "could destroy his career." Hearing Doc. 429 at 287:13–22. Even if that is true, in making legal and factual determinations in the cases before it, the Court simply cannot consider the effects its decisions may have on individuals' careers. To do so would be highly improper and it would privilege the career prospects of the person in question over the rights of the opposing party, in this case a criminal defendant. If the Court yielded to this kind of argument, it would also be withholding or even bending what it believes to be the truth. The government's argument on this point was inappropriate and the Court will not consider it.

Second, TFO Ramos's discussions with Ms. Fisher about the favorable letter to the parole board and his efforts to get her no-contact order dropped were neither brief nor fleeting; both involved multiple conversations with multiple people. With regard to the letter to the parole board, TFO Ramos spoke to Ms. Fisher about it directly on at least two separate occasions: July 8, 2020 and July 10, 2020. *See supra* at 19–20. And on a third occasion, TFO Ramos discussed the possibility of such a letter with AUSA Mysliwiec. *See id*. The Court also notes that, despite TFO Ramos's reported inability to remember these conversations in November 2020, he was able to recall specific details about them during the evidentiary hearing, which took place six months later. He testified, for example, that in his conversation with AUSA Mysliwiec about the letter, the two were "discussing the good moral conduct that Natalie had showed up to this point. She was in a very difficult position. She had been contacted by Mr. Robertson. She had been threatened over testifying. She had been harassed at the prison over testifying, and we were talking about that." *See supra* at 19. He continued that his conversation with AUSA Mysliwiec "had to have been before" he mentioned the possibility of a letter to Ms. Fisher because "that's why" he remembers mentioning it to her. *Id*. at 20. TFO Ramos further explained "[i]n context, I thought that this trial was going to happen in the fall, and I thought that Ms. Fisher would have already testified before– before she was eligible for release from prison." *Id*. The Court finds it hard to believe that TFO Ramos could have completely forgotten about these conversations with Ms. Fisher and AUSA Mysliwiec in November 2020 when, at present time, he remembers specific details about the conversations as well as why he made the statements to Ms. Fisher. And while it is true that TFO Ramos now has the benefit of the recorded calls and transcripts to refresh his recollection, the inquiry in November 2020 did not occur on a blank slate either: he was specifically prompted by this Court's order and AUSA Fontanez's email to remember any promises "to write a favorable

letter for her," referring to Ms. Fisher.  Gov't Ex. 1.

TFO Ramos's efforts and communications with regard to the no-contact order were even more involved.  The recorded phone calls show that he spoke to Ms. Fisher about the order on numerous occasions in July and August 2020.  *See supra* at 20–21.  He also testified that he spoke to Ms. Fisher's father to get information about the DHS attorneys involved in the case and then spoke to at least two Iowa attorneys via email and over the phone, Tracie Sehnert and Chelsey Yanders, before the no-contact order was finally dropped on July 22, 2020.  *See supra* at 22.  And because TFO Ramos was corresponding with Ms. Yanders and Ms. Sehnert about the no-contact order via email, he had a number of emails in his inbox on this topic in November 2020, including an email Ms. Sehnert sent him on August 24, 2020 that apparently included the dismissal paperwork for the no-contact order as an attachment.  Gov't Ex. 8.  Given the lengths to which TFO Ramos went to communicate with several different people about the no-contact order over the course of two months, it is hard for the Court to believe that he did not remember anything about the order and its dismissal when asked about any benefits he might have conferred to Ms. Fisher in November 2020.  TFO Ramos also testified that, in response to the Court's discovery order, he sat down, "looked at the case file," "looked at [his] notes," and "checked in [his] emails to ensure that [he] had not made any promises."  Doc. 429 at 17:12–14.  If TFO Ramos conducted such a review of his case file and emails, it is hard to believe that he would not have come across his various emails to and from Ms. Sehnert and Ms. Yanders from a few months prior, as well as the copy of the dismissal paperwork that he apparently received from Ms. Sehnert.  The fact that the dismissal of the no-contact order meant so much to Ms. Fisher and allowed her to see her young son for the first time in a long time, *see supra* at 25, also suggests that this is not the kind of thing that TFO Ramos would have easily forgotten.

Additionally, the testimony about TFO Ramos's November 2020 call with Ms. Fisher on the topic of promises and benefits suggests that the issue is more complicated than a simple failure of memory. If TFO Ramos simply did not remember discussing any promises or benefits with Ms. Fisher, as he has testified, the Court would expect the call to have been straightforward, with TFO Ramos telling Ms. Fisher something to the effect of "I cannot remember making any promises or conferring any benefits to you. Is that also your recollection?" Instead, however, TFO Ramos repeatedly testified that he asked Ms. Fisher if he ever made her *feel* as though he had promised her anything. *See, e.g., supra* at 17. He also testified that his question was not whether he had made her any promises, but whether he had made her any promises *in order to get her to testify*. *Id*. He stated, for example, that "[t]he point of the call was to make sure that Natalie did not feel that I made her promises or benefits in order for her to testify or to continue to testify. That was the point that I believe I got across in that call to Ms. Fisher." Doc. 429 at 20:6–9. But how Ms. Fisher *felt* about her conversations with TFO Ramos was not what the Court's order required the government to investigate and disclose; instead, the order simply required the government to disclose "any promises made or benefits conferred to any of its witnesses." Doc. 236 at 8. This was not a complicated question, nor was AUSA Fontantez's statement to TFO Ramos in her November 24, 2020 email asking him to confirm that he "ha[d] not made any promises to Natalie of any kind, including to write a favorable letter for her." Gov't Ex. 1. The fact that TFO Ramos significantly complicated the question by adding elements about how Ms. Fisher felt and whether the government was offering her promises in order to get her to testify suggests that the answer to the basic question about promises and benefits was more complicated than TFO Ramos simply not remembering.

The credibility of TFO Ramos's testimony on this point is further undermined by the way

that Ms. Fisher described the conversation. According to Ms. Fisher's testimony, "what he said was, I'm just calling to make sure that you know I'm not offering you any promises. I'm not helping you with anything." Doc. 429 at 245:25–246:2. This version of the conversation suggests that TFO Ramos was not asking Ms. Fisher whether he had made her any promises in order to find out the truth or refresh his recollection; instead, he was instructing her that no such promises were made. Ms. Fisher's description also finds support in some of TFO Ramos's own testimony, including his above statement about the "point" he was trying to get across in the call. *Id*. at 20:6–9. TFO Ramos also testified, at one point, "When I told Ms. Fisher I didn't make her any promises or benefits, I have no specific memory of this conversation." *Id*. 51:20–21. While this remark is confusing and hard to follow, TFO Ramos appears to have acknowledged that he "told Ms. Fisher" that he did not make her any promises or benefits, instead of asking her. *Id*. If that is in fact how the conversation went, it is not consistent with TFO Ramos's repeated testimony that he simply did not remember making any promises to Ms. Fisher. And while the Court ultimately does not know why TFO Ramos would misrepresent what he did and did not remember about his conversations with Ms. Fisher, his testimony provides one possibility: he believed that he had "jumped the gun" when he told Ms. Fisher about his conversation with AUSA Mysliwiec about the favorable letter to the parole board and felt that was something he "should not have" conveyed to her (rather than something he simply needed to tell the defense about). *See, e.g., Id*. at 51:12–13. TFO Ramos's testimony was replete with similar statements that he made a mistake by telling Ms. Fisher about the favorable letter and it was something he should not have said. *See id*. at 116:2–5 ("I definitely understand that was a benefit or a promise, and it's something I shouldn't have said. I regret it. I fully acknowledge that I made a mistake on that issue and I'll learn from it.").

Nor does the Court find credible TFO Ramos's testimony that he was simply inquiring about the status of Ms. Fisher's no-contact order and that he did not believe Ms. Fisher was asking him to get it dropped. When he was asked whether Ms. Fisher was asking him to help get the no-contact order dropped, TFO Ramos testified "I don't believe that's what she was asking" and "[t]hat was certainly not what I intended to do. I was going to look in to see if it still existed." *Id*. at 60:15–19. It is true that in an email TFO Ramos sent to Ms. Sehnert on July 22, 2020, he stated that he was "inquiring as to whether a no contact order is still in effective [sic] regarding the below persons." Gov't Ex. 8. It is also true that in an initial conversation with TFO Ramos on this topic, Ms. Fisher said "So, like, we don't get phone books or anything here, and I don't know if maybe there's a–like, a direction you can point me in to finding out how I can get this no contact order with my son. Um, I–not dropped. But I don't know what's the word." Gov't Ex. 10 at 3. Contrary to the government's suggestion, however, the Court does not believe that when Ms. Fisher said "not dropped" she meant she did not want the no-contact order dropped. The more reasonable interpretation of Ms. Fisher's statement is that she *did* want the no-contact order dropped because she wanted to have contact with her son but did not know the correct way to described the legal outcome she was seeking (whether, for example, the order needed to be "dismissed" or "lifted" instead of "dropped").

Perhaps more importantly, contrary to TFO Ramos's testimony that he was simply inquiring about the status of the order and was not trying to get it dropped on his or Ms. Fisher's behalf, *see* Doc. 429 at 64:24–65:3, Ms. Sehnert testified that when she spoke to TFO Ramos on the phone about the order, her impression was that "he was calling to say mom would like to have it dropped." *Id*. at 210:4. There is also Ms. Sehnert's email from July 22, 2020 in which she wrote that "Kacy Ramos reached out to Chelsea and said that mom was helping them with an

investigation in Arizona and he was hoping to get the NCO dropped so that she can have visits in prison." Def. Ex. T.  While it is true that Ms. Sehnert's email mistook Arizona for New Mexico and her testimony was somewhat inconsistent with the email by stating that it was Ms. Fisher, and not TFO Ramos, that wanted the no-contact order dropped, the evidence is consistent in suggesting that the Warren County Attorney's Office believed either TFO Ramos or Ms. Fisher wanted the no-contact ordered dropped, which is why the Office then moved to have it dismissed.  *See* Doc. 429 at 208:1–4 (Ms. Sehnert explaining that she emailed Eric Anderson asking for the order to be dismissed because "mom would like it dismissed").  The fact that TFO Ramos continued to communicate with the attorneys in Iowa for over a month until the order was in fact dropped and he received confirmatory paperwork from Ms. Sehnert also cuts against his explanation that he was simply inquiring about the status of the order; if that was the case, his job would have been done as soon as Ms. Sehnert confirmed the order was still active and he would have stopped communicating with her about it.

For all of these reasons, the Court finds that several portions of TFO Ramos's testimony at the May 3, 2021 evidentiary hearing were not credible.

## II.    Because the Prejudice Resulting from the Government's Nondisclosure is Minimal, it Did Not Ripen into a Due Process Violation.

Turning to the merits, Mr. Robertson argues that the government's failure to disclose the promises made and benefits conferred to Ms. Fisher violated his Due Process rights.  Doc. 396 at 12.  There is no general constitutional right to discovery in a criminal case.  *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  The government is obligated, however, to make the disclosures required by the Federal Rules of Criminal Procedure and by the Constitution's Due Process clause.  See Fed. R. Crim. P. 16.  In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is

material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In the Tenth Circuit, to establish a *Brady* violation, a defendant must show: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the defense. See *Trammell v. McKune*, 485 F.3d 546, 551 (10th Cir. 2007). Evidence is material under *Brady* if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 470 (2009). Put another way, *Brady*'s materiality threshold is met if the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

In *Giglio*, the Supreme Court made clear that the government's discovery obligations under *Brady* extend to any promises of leniency made to government witnesses because such promises are relevant to the witness' credibility. 405 U.S. at 154–55. Because the government in *Giglio* had failed to disclose a non-prosecution agreement between a prosecutor and a key witness, the Supreme Court reversed the defendant's conviction. *Id*. at 150–51, 155. The Court has since explained that impeachment evidence falls within the scope of *Brady* because it is "favorable to [the] accused" and "may make the difference between conviction and acquittal" if disclosed. *United States v. Bagley*, 473 U.S. 667, 676 (1985) (citations omitted).

Here, the undisclosed promises and benefits are clearly *Brady* material because they are critical impeachment evidence that goes to Ms. Fisher's credibility as a witness and her bias in testifying for the government against Mr. Robertson. Ms. Fisher is also a key government witness because she will testify about statements Mr. Robertson's reportedly made in advance of the shooting that suggest he had a motive to retaliate against D.S., an element the government has to prove to prove Mr. Robertson guilty of his obstruction of justice charge. *See* 18 U.S.C.

§ 1513(a)(1)(B). The undisclosed promises and benefits are therefore *Brady* material that the government was constitutionally required to disclose under *Giglio* and *Bagley*. *See Giglio*, 405 U.S. at 154–55; *Bagley*, 473 U.S. at 676.

The problem for Mr. Robertson, however, is that when the defense obtains undisclosed *Brady* material prior to conviction, the nondisclosure only ripens into a Due Process violation if concrete prejudice has accrued. "In a typical case involving an alleged *Brady* violation … the purported *Brady* material is not disclosed until after trial." *Burke*, 571 F.3d at 1053. The Tenth Circuit has nevertheless recognized that "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in *Brady*." *Id*. That is because, as the Tenth Circuit has capably explained,

> It would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial. … If a defendant could never make out a *Brady* violation on the basis of the effect of delay on his trial preparation and strategy, this would create dangerous incentives for prosecutors to withhold impeachment or exculpatory information until after the defense has committed itself to a particular strategy during opening statements or until it is too late for the defense to effectively use the disclosed information. It is not hard to imagine the many circumstances in which the belated revelation of *Brady* material might meaningfully alter a defendant's choices before and during trial: how to apportion time and resources to various theories when investigating the case, whether the defendant should testify, whether to focus the jury's attention on this or that defense, and so on. To force the defendant to bear these costs without recourse would offend the notion of fair trial that underlies the *Brady* principle.

*Id*. The Tenth Circuit has accordingly held that, at a minimum, "the belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an earlier disclosure would have created a reasonable doubt of guilt." *Id*. (citations and internal quotations omitted).

The *Burke* court emphasized, however, that the crux of the inquiry is whether the defendant has been prejudiced by the late disclosure. It stated that "not every delay in disclosure of *Brady*

material is necessarily prejudicial to the defense" and it approvingly quoted the Eleventh Circuit for the proposition that the focus of the due process violation is "not upon the fact of nondisclosure, but upon the impact of nondisclosure on the jury's verdict." *Id*. at 1056 (quoting *United States v. Kubiak*, 704 F.2d 1545, 1550 (11th Cir. 1983)). The Tenth Circuit continued that "[t]o justify an imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial." *Id*. This reasoning is consistent with cases in other circuits holding that "while the untimely disclosure of *Brady* material does not constitute a constitutional violation in itself, it may violate due process if the defendant can show he was prejudiced by the delay." *Id*. at 1055–56 (citing cases including *Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir. 2008), *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir. 1992), *United States v. Fallon*, 348 F.3d 245, 252 (7th Cir. 2003), *Leka v. Portuondo*, 257 F.3d 89, 101–04 (2d Cir. 2001), and *United States v. Devin*, 918 F.3d 280, 290 (1st Cir. 1990)).

The facts and ultimate outcome of *Burke* are instructive. There, the defendant moved the district court for an order compelling the government to disclose any immunity agreements between itself and its cooperating witnesses. *Id*. at 1052. The Court issued such an order and the government acknowledged its responsibility to comply. *Id*. The government nevertheless failed to acknowledge that one of its witnesses was testifying pursuant to an "informal plea agreement reached before trial." *Id*. When that information later came out during trial, the defense moved for the witness to be excluded. *Id*. The trial court denied the request and instructed the defense to "deal with [the] issue on cross-examination." *Id*. On review, although acknowledging the problematic nature of delayed *Brady* disclosures in the above-quoted passages, the Tenth Circuit rejected the defendant's *Brady* argument because it found that he had failed to "present the trial court with any credible reason why the delayed disclosure of [the witness's] plea agreement had

resulted in prejudice requiring the remedy he sought—the exclusion of all testimony by the witness about whom impeachment evidence was withheld." *Id*. In rejecting the defendant's argument, the Tenth Circuit noted that he had the opportunity to cross-examine the witness about his bias notwithstanding the late disclosure. *Id*.

The facts of the instant case are similar to *Burke*. The government flagrantly violated the Court's discovery order and failed to disclose *Brady* material to the defense. Had Mr. Robertson not obtained this information through his opposed Rule 17(c) subpoena to the Iowa DOC, and had he been convicted at trial without knowledge of the promises and benefits, the government's nondisclosure would have ripened into a *Brady* violation that could have easily led to the reversal of Mr. Robertson's conviction on appeal. The defense *did* obtain the promises and benefits prior to trial, however, and it has now had well over a month to prepare to use them on cross-examination as well as to investigate the issue further through the Rule 17(c) subpoenas the Court has granted. Nor has the defense pointed to much remaining prejudice resulting from the nondisclosure. As a result, Mr. Robertson has not established that the government's discovery violation ripened into an actual *Brady* violation for which the Court can impose the sanctions described in *Burke*. *See Burke*, 571 F.3d at 1055–56.

### III.    The Government's Failure to Disclose the Promises and Benefits Nevertheless Violated the Court's November 18, 2020 Discovery Order.

While the government's failure to disclose the promises made and benefits conferred to Ms. Fisher has not ripened into a Due Process violation, it is nevertheless a clear violation of the Court's November 18, 2020 discovery order. Doc. 263. As the Court stated above, the order could not have been more clear: it listed specific categories of information the government was required to disclose, including "any promises to write letters of support on behalf of witnesses in prison or facing criminal charges" and "any other promises or conversations that could be viewed as

involving a potential benefit to the witness." *Id*. at 8. The order clarified that the discovery obligations described therein extended to "any such promises made or benefits conferred by any Assistant United States Attorney; United States Attorney's Office staff member or paralegal; investigator; any local, state, or federal law enforcement officer working on this case; and any other person known to the prosecution working on this case." *Id*. To ensure compliance, the order required the government to "diligently investigate whether any of the individuals listed above made any payments or statements deemed discoverable by [the] order." *Id*. And the order required that the government "conduct such an investigation and produce any such discovery no later than Monday, December 7, 2020 at 5:00 p.m. Mountain Time." *Id*. at 8.

As the government concedes [Doc. 395 at 4], TFO Ramos's statements on July 8 and 10, 2020 assuring Ms. Fisher that he and the prosecuting attorneys on this case would write her favorable letters to the Iowa Parole Board clearly qualify as information the government was required to disclose under the Court's order because they were "promises to write letters of support on behalf of [a] witness[] in prison." Doc. 263 at 8. The government was also required to disclose TFO Ramos's months-long effort to assist Ms. Fisher with the no-contact order between her and her son because that effort conferred on Ms. Fisher a significant benefit when the no-contact order was dropped and she was able to see her son again. *Id*. It is hard for the Court to think of a more powerful benefit the government could confer than helping to reunite a mother with her young son. Ms. Fisher's testimony about how she wrote a letter to the Parole Board after her release pleading it to change her conditions to allow her to see her son is proof of just how important the issue was to her. *See supra* at 26. Because the Court's November 18, 2020 discovery order required the government to disclose these promises and benefits to the defense no later than December 7, 2020

and the government failed to do so, the government violated the order.[5]

## IV. The Appropriate Sanction is a Jury Instruction.

Given the government's clear violation of the Court's discovery order, the Court must determine the appropriate sanction to impose. "District courts have broad discretion to sanction a party who violated [its] discovery orders." *Golyansky*, 291 F.3d at 1249 (citation omitted). The Tenth Circuit reviews a district court's "decision to impose sanctions, and the court's choice of sanction, for an abuse of discretion." *Id*. In selecting the appropriate sanction, the district court should consider the so-called *Wicker* factors: "(1) the reasons the government delayed producing the requested materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the defendant as a result of the government's delay; and (3) the feasibility of curing the prejudice with a continuance." *Wicker*, 848 F.2d at 1061. "In the absence of a finding of bad faith, the court should impose the least severe sanction that will accomplish prompt and full compliance with the discovery order." *Golyansky*, 291 F.3d at 1249. "The preferred sanction is a continuance." *Id*. "It would be a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings." *Id*. To support a finding of prejudice, the district court must "determine that the delay impacted the defendant's ability to prepare or present its case." *Id*. at 1250 (citations omitted). The court should also "consider whether a continuance will effectively cure the unfair surprised suffered as a result of the Government's delayed disclosure." *Id*. (citation omitted).[6]

---

[5] The Court heard testimony at the May 3, 2021 evidentiary hearing about other undisclosed promises and benefits that may have also fallen within the scope of the November 18, 2020 order. The Court need not analyze each such statement, however, because the failure to disclose the statements about the letter to the Parole Board and the no-contact order was enough by itself to constitute a violation of the order.

[6] Several features of the Tenth Circuit's caselaw on the appropriate sanctions for discovery violations are problematic in practice. For one, the Tenth Circuit's preference for a continuance as the remedy leads to unintended consequences and perverse incentives. *See Golyansky*, 291 F.3d at 1249. The problem with

Mr. Robertson asks the Court to exclude Ms. Fisher's testimony as a sanction for the government's discovery violation. Doc. 396 at 1. But to do so and remain faithful to the controlling law of the Tenth Circuit, the Court would have to find that "the government acted in bad faith when it failed to comply with the discovery order." *Wicker*, 848 F.2d at 1061; *see also*

this rule is that, in cases such as this where the defendant has awaited trial for years while in custody, a continuance punishes the defendant more than it does the government. For this reason, Mr. Robertson did not want an additional continuance; he wanted the government to abide by its discovery obligations. By making a continuance the preferred sanction for discovery violations by the government, the caselaw forces defendants like Mr. Robertson to choose between their right to a speedy trial and their right to Due Process. And because a continuance is an essentially painless sanction that might actually help the government prepare for trial, it does little if anything to deter government misconduct. Unexpected continuances also wreak havoc on district courts' ability to manage their own dockets, meaning that in practice imposing a continuance as a sanction for government misconduct also hurts the court and the other litigants before it. In *Wicker*, the Tenth Circuit appeared to recognize this problem, affirming a district court's decision to impose a sanction other than a continuance because of the court's "pressing schedule" and "the failure of a prior continuance and deadlines to ensure timely discovery." 848 F.2d at 1062. In several cases following *Wicker*, however, the Tenth Circuit has reversed district courts for opting to do the same. *See Golyansky*, 291 F.3d at 1250 (noting that district courts should "consider whether a continuance will effectively cure the unfair surprise as a result of the Government's delayed disclosure" and reversing the district court's decision to impose an alternative sanction because "a continuance could have cured the prejudice to the Defendants' case."); *see also Gonzales*, 164 F.3d at 1292 (holding that it was an abuse of discretion for this Court to find that the prejudice resulting from the government's misconduct could not be cured with a continuance).

Another problematic aspect of the Tenth Circuit's caselaw in this area is the requirement that district courts find bad faith on the part of the government before excluding evidence or imposing other severe sanctions for discovery violations. *See Golyansky*, 291 F.3d at 1249. There are several problems with this requirement. For one, a bad faith requirement does not appear in the text of Rule 16, which explicitly allows courts to sanction discovery violations. *See* Fed. R. Crim. P. 16(d). In fact, Rule 16 lists a number of possible sanctions and, as a catchall, permits courts to "enter any other order that is just under the circumstances." *Id.* The bad faith requirement also prevents courts from holding the government accountable for flagrant discovery violations because it is extremely difficult for defendants to prove bad faith. As a result, the government can avoid meaningful sanctions by asserting that any discovery violation, however blatant, was the product of a mistake, or even gross negligence, but not bad faith. Finally, the bad faith requirement creates perverse incentives by encouraging the government to keep its agents in the dark and avoid training them on their discovery obligations because agents cannot deliberately violate requirements they are not aware of. For good reason, this is no excuse in the *Brady* context: the government's failure to disclose *Brady* material violates Due Process "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *see also Smith v. Sec'y of N.M. Dept. of Corr.*, 50 F.3d 801, 823 (10th Cir. 1995) ("[I]t is irrelevant for *Brady* purposes whether the nondisclosure was a result of negligence or design.") (citations and internal quotations omitted). To eliminate the perverse incentives that currently exist in the context of discovery under Rule 16, negligence should be no excuse there too. Until the Tenth Circuit reconsiders the controlling caselaw in this area, however, the Court is bound to follow it, and it will do so.

*Golyansky*, 291 F.3d at 1250 ("It would be a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings.").  For the detailed reasons explained above, the Court finds that TFO Ramos's testimony at the evidentiary hearing was not credible.  *See supra* at 26–32.  At the same time, the Court cannot confidently find that he acted in deliberate bad faith when he failed to disclose the promises he made and benefits he conferred to Ms. Fisher.  Nor can the Court find bad faith on the part of the prosecuting attorneys, especially given the efforts by AUSA Fontanez to reach out to TFO Ramos to inquire about any promises made or benefits conferred as required by the Court's discovery order.  *See* Gov't Ex. 1.  The reality is that the Court simply cannot determine "the reasons the government delayed producing the requested materials" on the current record.  *Wicker*, 848 F.2d at 1061.  For this reason, the record remains insufficient to support the extreme sanction Mr. Robertson requests by asking the Court to exclude Ms. Fisher's testimony from trial altogether.  *See Gonzales*, 164 F.3d at 1292 (describing the exclusion of evidence as "obviously the most severe sanction available").

As for the other *Wicker* factors, the extent of the prejudice to Mr. Robertson as a result of the government's nondisclosure and the feasibility of curing the prejudice with a continuance, *Wicker*, 848 F.2d at 1061, the Court has already continued the trial date from April 5, 2021 to May 17, 2021 as a result of this issue.  Doc. 404.  Although Mr. Robertson is correct that the Court ordered the continuance not as a sanction but as a means to learn more about the discovery violation and what the appropriate sanction should be, the continuance has also had the effect of curing some of the prejudice caused by the violation because it allowed Mr. Robertson time to prepare to use the undisclosed materials to impeach Ms. Fisher at trial.  The continuance also allowed Mr. Robertson to conduct further discovery and uncover more information about the extent to which TFO Ramos conferred a benefit on Ms. Fisher by reaching out to the county

attorneys in Iowa about her no-contact order.  Given the time and opportunity for further discovery afforded the defense, it is unclear what, if any, prejudice remains from the nondisclosure.

That said, the discovery violation at issue here was still egregious and it was harmful.  It is always inexcusable when the government fails to turn over material impeachment in its possession to the defense.  Here, the violation is made worse by the fact that, in order to avoid this exact situation, the Court issued a detailed order requiring the government to conduct a diligent investigation and report any undisclosed promises and benefits to the defense by December 7, 2020.  Doc. 263 at 8.  The purpose of the Court's order was two-fold: it was meant to protect Mr. Robertson's right to Due Process under *Brady* and it was meant to avoid any unnecessary continuances given the age of this case and the Court's extremely busy docket.  By failing to comply with the Court's order, the government frustrated both of those purposes and did serious damage to the Court's ability to manage its caseload because it lost its April 5, 2021 trial date with insufficient time to set another case for trial.  Due to the COVID-19 pandemic and there being only two courtrooms in the northern portion of the District of New Mexico that can accommodate jury trials, the Court had to wait over a month until another date was available to try this case.  And the discovery violation also required the Court to expend considerable judicial resources by holding an all-day evidentiary hearing on the matter on May 3, 2021.  Doc. 427.

For all of these reasons, despite the relatively minimal prejudice to the defense, the Court must still impose a sanction that sufficiently deters the government from continuing to violate the Court's discovery orders in a way that is extremely disruptive to the judicial process.  Although the Tenth Circuit's caselaw requires the Court to, in the absence of bad faith, "impose the least severe sanction that will accomplish prompt and full compliance with the discovery order," *Golyansky*, 291 F.3d at 1249, a meaningful sanction is still necessary to accomplish such

compliance given that the Court's detailed and specific discovery order failed to do so in this case. The Court believes that the sanction that will most effectively address the government's violative conduct while also recognizing the minimal prejudice to the defense and the lack of bad faith is a jury instruction advising the jury about the violation. The Tenth Circuit has made clear that district courts can impose jury instructions as a remedy for discovery violations. *See Burke*, 571 F.3d at 1054 (listing "instructions to the jury" as a potential remedy); *see also* Fed. R. Crim. P. 16(d) (allowing courts to remedy discovery violations by entering "any other order that is just under the circumstances"). The Court will accordingly give the following instruction as Jury Instruction No. 10, the final version of which will depend on the evidence at trial:

> You have heard testimony from Natalie Fisher, a government witness in this case. You are instructed that on November 18, 2021, the Court entered an order requiring the government to turn over any promises made and benefits conferred to Ms. Fisher by anyone working on behalf of the government. The defense was entitled to know about any such benefits and promises under the United States Constitution because they are relevant to Ms. Fisher's credibility and whether she has any reasons unrelated to the evidence to testify in a way that is favorable to the government or unfavorable to the Defendant, Dashawn Roberson.

> Despite the Court's order, the government failed to turn over certain promises made and benefits conferred to Ms. Fisher by Task Force Officer Kacy Ramos, another government witness. The information the government failed to turn over included statements Officer Ramos made to Ms. Fisher in July 2020 promising that the government would write favorable letters on her behalf to the Iowa Parole Board. The government also failed to turn over conversations Officer Ramos had with Ms. Fisher in July 2020 in which he offered to help her with a no-contact order that was prohibiting her from having contact with her son. After Officer Ramos spoke to several people about the issue, the no-contact order was dropped on July 22, 2020 and Ms. Fisher was able to have contact with her son again. Although the Court's order required the government to turn this information over to the defense on December 7, 2020, the government did not do so and the defense did not learn about it until March 2021. By failing to turn over this information to the defense, the government violated the Court's November 18, 2020 order.

> It is ultimately up to you to determine how much weight, if any, to give Ms. Fisher's testimony. In making that determination, you should consider any promises made and benefits conferred to Ms. Fisher by the government, keeping in mind that the government failed to disclose certain promises and benefits to the defense in

violation of an order of this Court.

The Court feels this instruction adequately sanctions the government's discovery violation by pointing it out to the jury and highlighting the issues to which it is most relevant: Natalie Fisher's credibility as a witness and whether her testimony will be biased by the promises and benefits conferred upon her by the government.

## CONCLUSION

For the reasons set forth above, the Court finds that the government violated the Court's November 18, 2020 discovery order [Doc. 263] when it failed to disclose the promises made and benefits conferred by TFO Ramos to Natalie Fisher by the December 7, 2020 deadline set forth in that order.  The Court will therefore impose the sanction described herein.

DATED this 13th day of May, 2021.


_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE